STATE v. NELS W. ELSBERG.[1]

January 17, 1941.

No. 32,351.

[1]Reported in 295 N. W. 913.

*Frank W. Murphy* and *Roger L. Dell,* for appellant.

*J. A. A. Burnquist,* Attorney General, *James F. Lynch,* County Attorney, *M. Tedd Evans* and *Hayes Dansingburg,* Assistant Attorneys General, and *William C. Green,* Special Assistant Attorney General, for the State.

LORING, JUSTICE.

This is an appeal from a judgment of conviction and from an order denying a new trial in a criminal prosecution under 2 Mason Minn. St. 1927, § 10053, charging defendant, former commissioner of highways of the state of Minnesota, with the crime of falsely auditing and paying claims upon the state. He was indicted with five others but had a separate trial.

The questions presented by this defendant are (1) that there was no crime shown to have been committed; (2) that his con-

viction rests solely upon the testimony of an accomplice or accomplices; and (3) errors alleged to have been committed upon the trial.

The transactions leading up to this prosecution were as follows: In the spring of 1937, while defendant was commissioner of highways and had complete control of expenditures from the highway fund, the road from Beaver Bay to one mile north of Gooseberry River, part of the North Shore Drive, was in very poor condition because of frost heaves and boils. Because of prospective tourist travel on the highway and the dependence upon the road by many persons living along it, the highway department considered it imperative that the road be repaired as soon as possible and gave notice by letters to six companies to bid on the job of eliminating the frost heaves and boils. The S. J. Reader Company, one of the defendants named in this indictment, with a bid of $24,628, was low bidder by about $2,000, and immediately started the work. When it was finished, on June 4,[2] the department concluded that the road was not yet in good condition. Therefore, it was decided to put on a "sand lift" preparatory to laying a bituminous mat. The Reader company had its equipment on the job, and the department directed the assistant administrative engineer, J. T. Flanagan, to direct the district engineer to have the Reader company lay the sand lift and that it be paid for the work on the basis of "material in place," under the prices fixed by the frost heave contract plus an item hereafter mentioned. "Material in place" means that the material is hauled and put in place at a unit price per cubic yard. The work, which was started about June 7 and completed by July 7, was finally cleaned up on July 15.

On July 1 a number of changes were made in the personnel of the highway department. L. L. Allen was made maintenance engineer to succeed W. F. Rosenwald. D. H. Gilchrist, formerly district engineer at Detroit Lakes, became assistant maintenance engineer to succeed Allen. James H. Bennetts was transferred from the maintenance division to the division of finance, both in the

[2] All dates are in 1937 unless otherwise stated.

central office at St. Paul. He had been a clerk and an accountant under various designations from 1925 to 1931 and from 1933 up to the time of this trial. In the interim between 1931 and 1933 he had been employed by the S. J. Reader Company.

On July 2, S. J. Reader came into Bennetts' office and complained that he had done work in the Duluth district for which he had not been receiving pay or estimates. Bennetts thereupon dictated a letter, which was signed by Allen and mailed, to the district maintenance engineer at Duluth, George A. Larson, which read as follows:

"We find from our records that partial estimates on contracts from your district are frequently not submitted until the work is practically completed. This practice inflicts a penalty on the contractor, particularly where the contract is for any considerable amount.

"At this time we understand that the work being done by the S. J. Reader Company between the Gooseberry River and Beaver Bay is nearing completion and as yet we have had no estimate for the work done. Please submit a partial estimate on this work as soon as possible."

On July 9, Larson replied that so far as the Reader company work between Gooseberry River and Beaver Bay was concerned he had never received a copy of any contract for the work, that the job was not complete, and that he understood that the basis of payment was on material in place. He further stated that since the work had been commenced on June 2 the first estimate would not have been due until July 1 in any event, and that pressure of work in his office had delayed the computing of estimates. Bennetts testified that he never saw this letter, but on July 20 he dictated and signed Allen's name to a letter directing Larson to submit requests for new authorizations for expenditures[3] on the projects on trunk highway No. 61 between Two Harbors and Beaver Bay and specifically stated what the requests should cover. However, before there was an opportunity to get an answer from

[3]Hereinafter referred to as A. F. E.'s.

Larson, Bennetts, either on the 21st or 22nd, found Allen and Gilchrist in Allen's office and on his own initiative took up with them the matter of the work on the North Shore Drive and discussed in particular the Reader job between Gooseberry River and Beaver Bay on which the sand lift had been placed. Bennetts testified that Allen then informed him that this work was to be paid for on the basis of unit cost as fixed in the frost heave contract which Reader had completed. Bennetts and Gilchrist drove to Duluth on the afternoon of July 22 and spent a large part of the next day discussing with Larson the work that was being done in the Duluth district, including the Reader sand lift job and how it could be paid for. Bennetts at that time figured out the unit prices, adding eight-tenths of a cent to the prices fixed in the frost heave contract on account of a strike which the Reader company had encountered in the work. This was done under Allen's instructions previously given at St. Paul. When these figures were extended, they resulted in a total sum of $60,528.54 (later recalculated at $60,543.67). Larson promised to have a request for an A. F. E. made out on the basis of material in place. Such a paper was prepared by him and sent to the department, estimating the total to be $74,787.64, which included $10,306.24 in items furnished by the state, not the contractor. At the same time, to expedite payment, he sent to Reader for signature a purchase order request covering the material in place at $60,543.67, which the Reader company executed and forwarded to the highway department. This was done, Larson testified, under instructions from Gilchrist. When the invoices from the Reader company, based on material in place, came to the director of purchases, Arthur C. Meyer, he refused to indorse them for payment because there had been no bids and the material was already in place. Statements from the Reader company dated July 19 were received by the department, and they were totalled by Bennetts, whose figures appear thereon, and amount to $71,-692.67, which, significantly, was within one dollar of the aggregate of the pay rolls hereinafter referred to. Bennetts testified that

he must have seen and totalled these statements in the latter part of July or the first part of August. Allen, who was a defendant in this indictment, was not called as a witness, but Bennetts asserted that the next time the matter came to his attention was on August 4 or 5, when he was requested by telephone to come to Allen's office, where he saw on Allen's desk pay rolls for rental of equipment covering the sand lift job, each prepared in triplicate, one white, one pink, and one yellow copy. These pay rolls purported to show the rental of equipment to the state for use on the sand lift job by Einar Jensen, P. C. Roth, Whitmas & Borg, and S. J. Reader Company covering various periods for various substantial sums, all of which, even including the Reader items, were later shown by the evidence to be false and fictitious charges.

Allen stated that the pay rolls had not been signed by the district maintenance engineer, that they were in connection with the work on the North Shore, and that the department was anxious to clean up the matter and get the thing straightened out. He asked Bennetts to take the pay rolls to Duluth to secure Larson's signature on them. Bennetts, who was then working in the finance division under H. B. Farley, wanted a clearance from his chief to make the Duluth trip. Allen promised to arrange that and, about an hour later, again called Bennetts on the telephone and said that he had mentioned the matter to Elsberg, who would see Bennetts about it at once. Bennetts testified that thereupon he went to Elsberg's office and that Elsberg said that "Allen had mentioned the matter of my taking these pay rolls to Duluth, and that he concurred in it, inasmuch as the matter had been of long standing, and that there was considerable pressure to clean the matter up"; that "the contractor had completed the work some time before, the work had been done for quite awhile, and that in consequence they wanted to clean up the matter as soon as possible." Bennetts testified that he then went back to Allen's office, took possession of the pay rolls, and went to Duluth on August 6, taking them to Mr. Larson and telling him that he had received them from Allen, that he had also talked to Elsberg, and that

he had brought them up on their instructions for Larson's signature. He told Larson of the conversations he had had with Allen and Elsberg. Larson did not want to sign the pay rolls, and the two men talked for about an hour. Finally Larson said, "I suppose this amounts to an order," to which Bennetts testified that he replied, "I suppose you could call it that." Larson then signed the pay rolls in his official capacity and retained the yellow copies for his files, as was the usual practice. Bennetts returned with them to his home in St. Paul that same evening, which was Friday. At that time the highway department was not open on Saturdays so Bennetts kept the pay rolls at his home until the following Monday, August 9, when he claims to have delivered them to Allen by leaving them on his desk. In some manner, however, they were stamped at the mail desk as having been received on August 10. Later in August, Reader called on Bennetts and obtained from him a list of the names and amounts appearing on the pay rolls in question. At that time Bennetts claimed that the warrants issued on these pay rolls were at the capitol. After they had been returned from the capitol with the state auditor's and state treasurer's signatures thereon, they were turned over to Elsberg's executive secretary, who had received a telephone call from Reader asking that he get them. The evidence showed that Reader got all of the proceeds of these warrants with the exception of one or two small deductions of items owed by the Reader company to some of the other payees.

■ The evidence leaves no doubt that a crime was committed. This is so obvious that discussion is not required. The question for us is whether there is legal evidence that defendant was a party to it.

■ If the defendant knowingly participated in the scheme or conspiracy to have the pay rolls audited and paid, he is guilty of the crime charged; but his connection therewith, so far as direct testimony is concerned, lies wholly in the testimony of Bennetts, and it is defendant's claim that upon this record Bennetts was, as a matter of law, an accomplice and that his testimony is un-

corroborated as required by statute. Our statute, 2 Mason Minn. St. 1927, § 9903, provides:

"A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

Was Bennetts an accomplice as a matter of law? The general test to determine whether a witness is an accomplice is whether he himself could have been indicted for the offense. State v. Smith, 144 Minn. 348, 352, 175 N. W. 689. If he could have been so indicted, then he is an accomplice. If he could not have been so indicted, he is not an accomplice. 2 Mason Minn. St. 1927, § 9917, provides:

"Every person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids and abets in its commission, and whether present or absent, and every person who directly or indirectly counsels, encourages, hires, commands, induces, or otherwise procures another to commit a crime, is a principal, and shall be indicted and punished as such."

Whether or not Bennetts could properly have been indicted for this offense is determined by 2 Mason Minn. St. 1927, § 10623, which provides that the grand jury shall find an indictment when all the evidence taken together is such as, in their judgment, would, if unexplained or uncontradicted, warrant a conviction by the trial jury.

Bennetts was fully advised of the situation in regard to the work which was done by the Reader company between Gooseberry River and Beaver Bay. He knew that that company, for whom he had previously worked, had the contract for reducing the frost heaves and boils, and he was aware on July 2 that the company had been doing work, following the completion of that contract, for which it had not been receiving estimates. His letter to the Duluth district office conclusively shows that. He and Gilchrist

went to Duluth for the purpose of straightening out the confusion that existed in that office and not solely to get requests for A. F. E.'s to cover situations where there were none or where they had been overdrawn. At Duluth the question of how it was possible to pay for the work which had been completed by the Reader company was fully discussed. Bennetts knew that the sand lift job had been done and completed by Reader and not by rental of equipment from the various people whose names subsequently appeared upon the rental of equipment pay rolls. He had himself figured the unit prices upon which $60,528.54 should be paid for the material in place based upon the unit prices which had prevailed under the frost heave contract plus a bonus for the trouble which the contractor had had during a strike, so that, when he was called to Mr. Allen's office and saw there the unsigned pay rolls, which he must have known were prepared at the central office and which of itself was an irregularity, he then became aware, if he did not already know, that the Reader company could not be paid upon the basis of material in place and that another method of payment was being attempted. Though his testimony on this point was at first evasive, he undertook to say on the stand that he was not then aware of the contents of these pay rolls, that he merely put them in his brief case and subsequently took them to Duluth without examining them, and that during the discussion with Larson at Duluth he still was ignorant of the contents of these documents, in spite of the fact that Larson did not want to sign them and finally did so upon the assurance from Bennetts that his instructions from Allen and Elsberg amounted to an order to Larson to do so. Bennetts testified that he regarded the deal as "screwy" and irregular. When asked in what respect he regarded it as irregular, he said that it was because the pay rolls were prepared in St. Paul instead of Duluth, although he admitted that pay rolls were sometimes prepared in St. Paul. That he was then ignorant of the contents of the pay rolls strains credulity past the breaking point, and reasonable minds functioning judicially could not conclude otherwise than

that he was fully aware of their contents and the purpose for which they were being signed. The pay rolls, which are before us, were so set up that their character could not be mistaken. The very first sheet disclosed a payee other than the Reader company. That being the case, we can reach no other result than that, as a matter of law, Bennetts was an accomplice. He later furnished to Reader a complete list of names and amounts which he got from the pay rolls while they were in process of auditing and approval. Under the statute, a grand jury would not only be justified in finding an indictment against Bennetts for the crime with which this defendant is charged, but would be derelict in its duty if it did not do so. The trial court erred in submitting to the jury the question whether Bennetts was an accomplice. This was error with prejudice because the jury might have concluded that Bennetts was not an accomplice and needed no corroboration. The defendant is entitled to a new trial.

■ In view of a new trial, it becomes necessary to dispose of some of the questions raised by the state. The testimony of Bennetts is the only direct evidence in this record of Elsberg's connection with the auditing and payment of these false and fraudulent claims. The state contends that Bennetts' testimony is corroborated by the fact that the jury must have found, in order to convict, that Elsberg's own testimony, in which he denied any conversation with either Allen or Bennetts in regard to these pay rolls, was false, and it cites the well established rule that fraudulent conduct on the part of a party relative to his defense, if established, constitutes affirmative evidence of the lack of truth and merit in his cause. At common law, the desirability for corroboration assumed that the witness's interest in shouldering the blame onto someone else tended to impeach his reliability as a witness and made desirable a rehabilitation by means of corroboration as to some part of the accomplice's story. Juries were admonished to be cautious in accepting the testimony of accomplices without corroboration. Even if an accomplice be not corroborated as to any part of his story, this court holds that evidence of

fraudulent conduct on the part of an accused, such as the attempted bribery of a witness or of a juror, sufficiently supports the accomplice's story to satisfy the statute. State v. Ettenberg, 145 Minn. 39, 176 N. W. 171. So far as we can find, however, no case has gone so far as to hold that the mere fact that the jury does not believe the accused's denial of guilt and considers it false constitutes sufficient evidence of fraudulent conduct on accused's part to support the evidence of an accomplice or constitutes additional evidence against the accused. In Commonwealth v. Trefethen, 157 Mass. 180, 199, 31 N. E. 961, 968, 24 L. R. A. 235, in commenting upon denials of guilt made prior to trial, the court said:

"While evidence that the defendant has knowingly made false statements in regard to many facts which are relevant to the issue is admitted against him, as tending to show his guilt, it is not competent for the government to contend that a denial of guilt is of itself evidence against the defendant. To argue that, by the other evidence, the defendant is shown to be probably guilty, and that therefore his denial of guilt is false, and is additional evidence against him, ought not to be permitted."

To reach any other conclusion as to denials made on the trial would, in our opinion, nullify the protection given the accused by the statute.

■ The state further takes the position that certain circumstances amount to corroboration. It contends that the fact that the Reader company had a large proportion of the so-called emergency contracts let without advertisement for competitive bids, that Reader was apparently a favored contractor, upon friendly terms, and a frequent caller at the highway department showed fraudulent conduct on defendant's part tending to corroborate Bennetts' testimony.

The rules relative to circumstantial evidence in criminal cases are well established, and, while an accomplice's testimony need only be corroborated on some material point, nevertheless, if the circumstances relied upon are as consistent with innocence as

with guilt, they fail to satisfy the rule. The circumstances relied upon by the state would be admissible as background for some circumstance inconsistent with innocence, but, without such circumstance, they do not amount to corroboration nor do they tend to convict the defendant as required by § 9903.

The defendant had a multitude of affairs to be administered by his department and necessarily delegated numerous responsibilities to various subordinates and divisions, among which, strange to relate in the face of this record, were a legal department and a finance division. No comment is required on the administration of departmental affairs which permitted contractors to work without contracts and to be paid for rental of equipment never contracted for and which was not even in that part of the state during the time covered by these pay rolls. Those facts speak for themselves.

Other errors assigned require no comment.

Judgment and order denying new trial reversed.

