[Crim. No. 4158. Second Dist., Div. Three. Dec. 11, 1947.]

THE PEOPLE, Respondent, v. JAMES HALE et al., Appellants.

Walter L. Gordon and Phi. O. Clough for Appellants.

Fred N. Howser, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

SHINN, Acting P. J.—Defendants James Hale and J. Sydell Peterson were accused by indictment of the crime of grand theft in that they unlawfully took the sum of $5,000, the personal property of the St. John's Baptist Church. They were tried by jury which found them guilty of said offense. Their motions for a new trial were denied, whereupon proceedings were suspended and each defendant was granted probation for a period of 10 years, the first six months of the probationary period to be served in the county jail and each defendant was ordered to make restitution in the sum of

$2,500 to the St. John's Baptist Church. Each defendant appealed from the judgment and the order denying his motion for a new trial. Since no judgment was rendered, the attempted appeals from the judgments should be dismissed.

Defendant Peterson, an ordained minister, had been pastor of St. John's Baptist Church of the city of Los Angeles for some two years prior to the occurrence which culminated in this prosecution. Sylvester Davenport was recording secretary of the church, and a Mr. Bailey was one of the deacons. Herbert Alvin Howard was financial secretary.

In October, 1945, St. John's Church found it necessary to surrender possession of a Japanese Buddhist temple, which it had been occupying under lease, and to find other church quarters. The Zion Hill Baptist Church was about to vacate its church property on East Twenty-second Street and move to a new church building on McKinley Avenue. Defendant Hale was chairman of the board of trustees of the Zion Hill Church, a position which he had held for some four years, and it was his general duty to look after the church finances; Reverend Grant Harris was the pastor of the church. Defendant Peterson requested Mr. Davenport to help find a new church property and suggested the one being vacated by the Zion Hill Church. Davenport contacted defendant Hale and reported to Peterson that the church could be purchased, and that Hale had requested that Peterson talk with him about it. Thereupon, Peterson, Bailey and Davenport went to Hale's house and met Hale, who told them that he could not sell the property until the church had occupied its new building for about 30 days, but that he would give them a chance to buy it. Thereafter, Peterson called a meeting of the board of his church, and after approval by the board of the plan to acquire a church property, had himself, Bailey and Davenport appointed as a committee to negotiate for the purchase of the Zion Hill property. The committee of three conferred several times with Hale at his home, and at the latter's suggestion Davenport was made chairman of the board of trustees in order that he might have authority to negotiate on behalf of his church. After the Zion Hill congregation had moved, other meetings were held at Hale's house. The committee made a bid on the property and Hale fixed a price of $25,000, $5,000 to be paid in cash and the balance at the rate of $200 per month. The matter of the purchase at this price was presented by the committee to the

congregation of St. John's. Thereupon, the church body approved the general plan. It was explained, however, that $10,000 cash would be required. Peterson testified that he, Davenport and Bailey had had a conversation with Hale in which the latter told them he would have to have $10,000 cash altogether, $5,000 to be paid to him as trustee for his church to be used in painting and renovating the new church building, that there would be a controversy if he went to the church treasury for the money and that after the congregation had been in the new building for 30 days and had had a meeting, a credit of $5,000 would be given on the purchase. Davenport, on the stand, denied all knowledge of such an arrangement and testified that only $5,000 was to be paid in cash. It was nevertheless represented to the congregation of St. John's that it would be necessary to raise $10,000 and this was done, $8,000 by subscription, and $2,000 by means of loans from parishioners, which were to be repaid in 30 days. Following a meeting of the committee two checks were written by Mr. Howard as financial secretary of St. John's, one check for $5,000 being made payable to James Hale, and one for $5,000 in favor of the company that was to act as escrow holder. Davenport testified that at the meeting he suggested that they call Hale to see how the check for $5,000 was to be written and that Peterson said they would make out two checks, one to Hale and the other to the escrow holder; that Bailey said that Howard would object to that, and that Peterson said that he would take care of Howard. Peterson did call Howard, and the latter, at Peterson's request, wrote the two checks and the same were signed by Howard and Bailey and given to either Bailey or Davenport and taken to Peterson, who placed his "O. K." on them and handed them back to Davenport or Bailey. Howard testified that when he wrote the checks he understood, from statements of the committee to the congregation, and from the directions given him by Peterson, that $10,000 cash was required. Hale, Peterson, Davenport and Bailey met at the title company in the office of Mr. Gorman, escrow and title officer. Gorman testified that Hale arrived first and gave information for instructions, stating that the church property was being sold for $25,000, $5,000 down, and a promissory note for the remainder payable at $200 or more per month; that Hale, at that time, had the $5,000 check payable to himself and offered to deposit it in the escrow; that he was told by Gorman that he would

have to endorse it and give instructions for its use in the purchase of the property, or furnish another check in favor of the title company, and that Hale said he would get a new check. Gorman also testified that Hale then picked up the check from the desk, and that he, Gorman, did not see it thereafter. Hale left and returned with Davenport. Peterson and Bailey arrived later and the instructions were signed by Peterson and Hale. No check was delivered to Gorman at this time but later, on the same day, Hale and Peterson returned and a $5,000 check, payable to the title company, was handed in. In testifying to the occurrence Gorman was unable to recall which of the two produced the check. A note for $20,000 and trust deed were prepared and were afterwards executed by Peterson. In the office of the title company no mention was made of any money to be paid outside of escrow.

The $5,000 check in favor of Hale next appeared the following morning at the bank upon which it was drawn. Peterson, Hale and Bailey were present at the teller's window, and Peterson introduced Hale to the teller and asked her to cash the check for him. According to the testimony of the teller she suggested that they take a cashier's check, but Hale wished the cash and it was paid over in $5, $10 and $20 bills. Hale recounted the money in the presence of Peterson and Bailey and at his request was given four envelopes, in two of which the bills were placed, each one being entirely filled. The teller testified that the envelopes were picked up by Hale and that the three men then walked away from the window. There was testimony that Hale, Peterson and Bailey walked to Hale's automobile which was parked near by. Just outside the bank they met Davenport and spoke with him. Davenport testified that he saw an envelope in Hale's hand at the time and that he saw another similar envelope in the pocket of Peterson's suit or overcoat. Hale drove away in his car while Peterson and Bailey stood by. It is here that all direct trace of the money disappeared. Bailey, who perhaps could have explained what happened to it, died before the case was tried. Peterson testified that Hale placed the envelopes containing the money on the seat of his car, laid a revolver beside them, announced that he would have to be going, and drove away. Hale testified that Peterson took the money, announcing that he would take care of it, put it in his pocket, and that he, Hale, then drove away. Each insisted that he

got none of the money and that the other got all of it. None of it has been recovered.

Hale, a few days before this event, had purchased a car for $400 cash and monthly payments of $65, and in the following month he purchased a home, paying $1,000 down, and in the following month an additional $1,000, and assumed payments of $75 per month. He had no bank account and the mentioned payments were made in cash. Nine hundred and fifty dollars, he testified, he received in the form of bonds from his wife, who was a postal clerk. His income from all sources was around $65 per week. The foregoing is an outline of the problem that was submitted to the jury.

It is earnestly contended by counsel for Peterson that the evidence tending to prove his guilt consists only of the uncorroborated testimony of the accomplice, Hale, and that it was therefore insufficient to justify the verdict as to him. Defendant Hale submits his appeal upon the briefs of defendant Peterson which, as we have seen, place all the blame for the theft upon Hale.

We find the evidence sufficient to support the verdicts. It is considerably stronger as to Hale's guilt than as to Peterson's and we shall discuss it particularly only as it applies to the latter. It will be necessary to review it at some length in determining another matter, namely, whether certain statements of the deputy district attorney in his opening argument were so prejudicial to the rights of defendant Peterson as to require a reversal of the order denying his motion for a new trial. It will appear, from what we have to say in that connection, that while the evidence of Peterson's guilt was inconclusive, it was not legally insufficient.

Defendants urge as ground for reversal misconduct of the district attorney, consisting of improper statements during his opening argument to the jury. The record on this point reads as follows: "MR. CRAIL: If your Honor please, and counsel for the defense and members of the jury, what I am going to say of course is not evidence in this case. It is my object to see that this jury arrives at a proper verdict, a verdict that will express the truth. Now, in this case there isn't any dispute at all about the theft of $5,000.00. That is very definitely established and no one disputes it. Each defendant, of course, blames the other one. The Grand Jury after hearing the testimony returned an indictment against both defendants on the theory that both defendants

were guilty— MR. GORDON: Just a moment, we cite that as error, and ask your Honor to caution counsel not to argue on what theory the grand jury returned it. THE COURT: After all, Mr. Gordon, one of counsel's duties is to sum up the evidence and draw such inferences from the evidence as he may deem it warrants. MR. GORDON: The Theory on which the grand jury returned an indictment is not evidence. THE COURT: The record will show your statement. MR. GORDON: I assign it as misconduct and ask your Honor to instruct the jury to disregard such remarks. MR. CLOUGH: I make the same objection. THE COURT: You may proceed, Mr. Crail. MR. CRAIL: When I say that the Grand Jury had a theory, of course, I don't know what their theory was, except the inference to be drawn by the action they took; but the Grand Jury must have believed that both defendants were guilty or they would not have indicted them. MR. GORDON: May I make the same objection and have a running objection to any remarks along that line by the District Attorney. THE COURT: All right, Mr. Gordon.'' It will be noticed that the district attorney took occasion to repeat and elaborate upon the statement to which defendants had objected, and this, no doubt, was due to his understanding that the court had ruled that the remarks were proper. His opening argument closed with the following statement: ''That is why I say the grand jury was right when they indicted both of them.''

The attorney general discusses the following authorities on the point: *People* v. *Lee Chuck,* 78 Cal. 317 [20 P. 719]; *People* v. *Grider,* 13 Cal.App. 703. [110 P. 586]; *People* v. *Brown,* 81 Cal.App. 226. [253 P. 735]; *People* v. *Edgar,* 34 Cal.App. 459, 467 [167 P. 891]; *People* v. *Schmidt,* 33 Cal. App. 426, 439 [165 P. 555]; and also quotes from 8 Cal.Jur., p. 264, refers to *People* v. *McKenzie,* 12 Cal.App.2d 614 [55 P.2d 1200], and closes his discussion of the point as follows: ''From the above authorities it must be concluded that said remarks of the district attorney in the case at bar were improper. The impropriety thereof, however, does not warrant a reversal of the order denying a new trial [citing cases]. The evidence in the instant case in itself, unaided by said remarks of the district attorney, shows beyond doubt that both defendants were guilty of the crime charged.'' It is a fair and proper statement of the law and if we could agree that there was strong evidence of Peterson's guilt it would

follow that the statements of the district attorney, although improper, would not furnish ground for a reversal. But arguments of this nature by prosecutors have consistently been deemed ground for reversal when guilt has not been clearly established. (See cases collected in 75 A.L.R. 53, 127 A.L.R. 357.) We are far from satisfied that the rights of defendant Peterson were not prejudicially affected by the district attorney's improper argument. Although we are of the opinion that the evidence was sufficient to support a verdict of guilty as to Peterson, there were circumstances pointing toward innocence, as well as circumstances pointing toward guilt, and there was evidence which, if given full effect by the jury, would have cast serious doubt upon the credibility of the witness Davenport.

In determining whether the evidence which was to be weighed in deciding the question of Peterson's guilt was such that the improper statements of the district attorney probably led the jury to return a verdict of guilty and brought about a miscarriage of justice we must examine the evidence which the jury accepted as sufficient to establish guilt and also the opposing evidence. We must weigh the evidence to determine the strength of the case for the People.

It was the theory of the People that Peterson conceived the plan to steal the money and persuaded Hale to join him in the theft; that he represented to his congregation that $10,000 cash was needed, but concealed the fact that $5,000 was to be paid to Hale directly; that he deceived Bailey and Davenport by stating that whichever of the two checks was not used would be destroyed and that he and Hale divided the money which they had placed in envelopes as soon as it was received from the bank. There was evidence that Peterson had known Hale but a few weeks, that he made no inquiry as to his responsibility, that he made no check of Hale's claim that he needed $5,000 for renovation of the new Zion Hill Church, that he exacted no receipt from Hale and no written promise that the $5,000 credit would be forthcoming; that he did not report the matter to his congregation; that he exhibited no diligence to obtain the credit, made no complaint to Reverend Harris, Zion Hill's pastor, and showed no interest in placing the matter before the district attorney. Also, he signed the note and trust deed for $20,000 and caused nothing to be stated in the escrow instructions as to the payment that was being made to Hale. These and other details of less importance

tended to support the theory of guilt advanced by the People. They could lead only to the conclusion that Peterson was guilty of theft or that he was gullible and negligent in the extreme. Much that is urged against him assumes the truth of Davenport's testimony. The jury no doubt believed it and in doing so found a way to reconcile it with certain established facts which tended to impeach it. This we believe was not altogether easy to do. Although Davenport testified that he had never been informed that $5,000 was to be paid to Hale or that $10,000 was to be used in the purchase, he also testified that he knew that $10,000 was being raised, $8,000 from subscriptions and $2,000 from loans. He knew also that the $2,000 was borrowed for 30 days and that Bailey and Peterson had each borrowed $1,000 from a bank, on their own security, for the purpose of repaying the loans. Mr. Howard, admittedly a man of probity and one who was scrupulous in handling the funds of the church, testified, as did his wife, that Davenport was present when the two checks were written and signed by Howard and Bailey. He also testified that the committee, Peterson, Davenport and Bailey explained to the congregation that $10,000 cash was needed, and also that from the general discussion and from directions he received from Peterson, he understood that the two checks of $5,000 each were to be used in the purchase. Accordingly, he noted on one of the checks "subscription down payment $5,000 on purchase of property" and upon the other "For escrow $5,000," these notations, he testified, being made when the checks were written. While Davenport testified that he waited outside in his car and did not enter the Howard house while the checks were being written, he did not deny having reported to the congregation that it was necessary to have $10,000 cash to use in the purchase. Incidentally, Davenport testified that he handed Hale as a "love offering" an envelope containing $600 and that he had "put in" $300 of it himself. There was evidence that he reported to his associates that the transaction was costing them $600. Hale testified that the envelope contained only $300. No other explanation was made as to where the money came from nor the purpose of the donation. The incident is mentioned here only because it throws some light on the informal manner in which authority was exercised over the funds of the church and its members by its representatives. The laxity which characterized the entire transaction did not necessarily indicate

wrongful motives. When the escrow agreement had been signed, and although Hale had possession of both checks, Davenport made no suggestion that one of them be destroyed nor did he thereafter make any inquiry as to whether the check or the money it represented had been returned to the church. Peterson testified that the arrangement to pay $5,000 to Hale was made in a conversation which took place in an automobile, Peterson, Hale, Davenport and Bailey being present. Davenport denied that the conversation had taken place or that he had been in an automobile with the other men. One Comer, a member of Zion Hill Church, and apparently a disinterested witness, testified to having seen the four men drive away from the church under the circumstances described by Peterson. Davenport testified that he was not on friendly terms with Peterson. In short, there was an abundance of evidence in the way of direct contradiction which the jury could have regarded as sufficient to discredit the testimony of Davenport. There were also circumstances to be mentioned later which were inconsistent with an intention on the part of Peterson to steal the money. It would have been difficult to evolve a theory of Peterson's guilt without believing that he received at least a part of the money. It is therefore reasonable to infer that the jury believed Davenport when he testified that as they left the bank Hale had an envelope in his hand and that Peterson had a similar one in his pocket, testimony which was elicited and was relied on to prove a division of the money. Davenport testified that on the morning after the escrow was opened Bailey told him that he, Bailey, Davenport and Peterson were to meet Hale at the bank, that Peterson had directed Hale to the wrong branch and wished Davenport to get him and bring him to the right one, that he, Davenport, did as requested, left Hale at the bank, parked his car, and when he returned to the bank, met the three men as they came out and saw Hale and Peterson each with an envelope. He apparently asked no questions concerning the money and was told nothing. It is to be noted that Peterson was known at the bank, and that all that was necessary to enable Hale to cash the check was Peterson's introduction. Why he should have planned to have Bailey and Davenport present when the check was cashed, if he and Hale intended to steal the money is not explained, and is difficult to understand. According to Davenport, Bailey had reported that they wished to get

some money to repay what they had borrowed, but the money was already in the church bank account and it does not appear that this matter was mentioned when they met at the bank. There is little doubt that Hale kept a substantial part of the money. He did not accept delivery of his new car until after he had received either $600 or $300 from Davenport; he did not explain where the $2,000 came from which he paid on his purchase of a house, except for $950 in bonds which his wife gave him, and he did not call his wife as a witness or furnish any corroborative evidence that they possessed any bonds. The questions constantly recur why, if the defendant, Peterson, intended to steal the money, would he have called in witnesses to the cashing of the check and why, if defendants intended to divide the money would they have done it before witnesses whose presence Peterson had arranged for? Hale testified that he had never demanded or expected to receive $5,000 or any other sum, that he handed the check back to Peterson in the escrow office, that Peterson had it at the bank and arranged for Hale to cash it, claiming that they were intending to repay money they had borrowed and that their financial secretary was out of the city for several days. He admitted having carried a gun but denied Peterson's testimony that he placed it on the seat of his car by the money as he drove away. His testimony that he gave the money to Peterson was disbelieved by the jury. There were improbabilities in each defendant's story. Judged by ordinary business practices, the entire transaction was irregular and illogical. Hale's account of the reasons for cashing the check was disproved. The jury believed that there was some arrangement for him to receive two thousand dollars or more. The device of having money paid to him directly would appear to have originated with him. The Zion Hill Church was spending some $5,000 in improvements on the new building, Hale was its business manager with authority to arrange terms of the sale. It seems more probable that he asked that $5,000 be placed with him in his official capacity to be spent on the church than that Peterson invented this excuse for getting money into the hands of Hale.

The conclusions we reach from this analysis of the evidence are that there was sufficient evidence to establish the guilt of each defendant; that as to Hale the evidence is strong and satisfactory, but that as to Peterson it is much weaker.

The remarks of the court, doubtless through inadvertence, classed the statements of the district attorney as a summation of the evidence and inferences to be drawn therefrom, and therefore legitimate argument. We are bound to assume that the jury believed that the grand jury, acting in its official capacity, had made a determination that both defendants were guilty and that the indictment of both defendants was evidence of that fact. The logical effect of the statements and rulings was to authorize, if not to direct, the jury to take into consideration, in weighing the evidence of guilt, the assumed fact that the grand jury had already found the defendants guilty. Furthermore, the statement of the district attorney that he did not know upon what theory that conclusion had been reached was a suggestion that there may have been evidence before the grand jury which furnished a theory of guilt not deducible from the evidence at the trial.

We conclude that the verdict against Peterson probably resulted from the improper statements of the district attorney and the court's ruling thereon, but that this is not true of the verdict against defendant Hale.

The order denying the motion of defendant Peterson for a new trial is reversed; the order denying the motion for new trial of defendant Hale is affirmed. The attempted appeals from the judgments are dismissed.

Wood, J., and Vallée, J. pro tem., concurred.

Appellant Hale's petition for a hearing by the Supreme Court was denied January 8, 1948.