[Crim. No. 5461. In Bank. Dec. 22, 1953.]

THE PEOPLE, Respondent, v. WILLARD WAYNE, Appellant.

Harrison W. Call for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Wallace G. Colthurst, Deputy Attorney General, J. F. Coakley, District Attorney (Alameda), Richard H. Chamberlain, Assistant District Attorney, and Ray Mellana, Deputy District Attorney, for Respondent.

SCHAUER, J.—Defendant and Thomas Redden were charged by indictment with (count one) violation of section 653f of the Penal Code by soliciting Joseph May "to offer and to join in the offer of a bribe" to police officers, and (counts two and three) two violations of section 337a of the Penal Code

by making book and by keeping a room with books and paraphernalia for recording bets. Redden pleaded guilty to all three counts and May was separately charged with and pleaded guilty to bookmaking. A jury found defendant guilty on all three counts. Defendant appeals from the ensuing judgment and from an order denying his motion for new trial.

The principal prosecution witnesses were May and Redden. According to their own testimonies they were closely connected with the criminal activities of which defendant was convicted. Defendant's main contentions relate to the necessity for and sufficiency of the corroboration of their testimonies. We have concluded that these and other contentions of defendant, hereinafter stated and answered, are without merit.

The testimony of May and Redden is to the following effect:

May, a bookmaker, had been charged with bookmaking in Oakland in July, 1950, pleaded guilty, and was granted probation. May had become acquainted with Redden through Redden's having placed bets with him. In August, 1950, May told Redden that he wished to establish bookmaking operations in Alameda and "would have to have 100 percent protection" from police interference because he was on probation; he asked Redden to aid him in arranging for such protection. Redden recalled that on social occasions he had seen defendant in the company of Alameda police officers and told defendant of May's proposal. Defendant said that he would attempt to arrange for protection. A few days later defendant reported to Redden that he had arranged with a lieutenant of the Alameda police force that May would receive protection in exchange for a "pay-off." Defendant, May and Redden then met by appointment and defendant told May that he had arranged for him to operate safely on certain conditions as to location and manner of operation. Thereafter arrangements for weekly payments for protection were completed and May commenced bookmaking operation. He made periodical payments for protection to Redden who in turn delivered the payments to defendant. Defendant told Redden that out of the payments he purchased cases of whiskey and a slot machine which he gave to police officers. The balance of the payments was divided between defendant and Redden.

May discontinued bookmaking operations for a time after defendant warned him that the police planned to raid the

establishment; operations were resumed when defendant advised that he had arranged with the lieutenant that May could operate with protection at a new address.

On January 12, 1951, police officers went to the bookmaking establishment and arrested May. At the police station May complained that he should not have been arrested because he was paying for protection through Redden and defendant to the above mentioned lieutenant. The arresting officers called in the lieutenant; May repeated his account of paying for protection; and the lieutenant said that May was lying. The lieutenant then went to Redden's place of business and told him of May's arrest and disclosures as to protection and asked Redden what story he planned to tell at the police station. Redden replied that he would say that May had borrowed $1,000 from him (actually Redden had invested $1,000 in the bookmaking business) and that the periodical payments were on the loan; the lieutenant replied, "I guess that story is as good as any." After Redden and the lieutenant had visited the police station, and Redden had told the above mentioned story, the lieutenant asked Redden to get in touch with defendant as soon as possible and to let him (the lieutenant) know what Redden learned. Redden telephoned defendant's home and defendant's wife told Redden that defendant would be at a hotel in Sacramento after 8 o'clock that night. Redden gave the lieutenant the number of defendant's hotel and thereafter reached defendant on the telephone and told him "that they had picked May up and . . . he was screaming his head off" because he had not received protection.

After defendant returned to Oakland Redden told him of his story of a loan to May. When he was questioned by a deputy district attorney defendant told a similar story of a $1,000 loan from him to May which May was to repay in weekly installments of $100 with two additional $100 payments as interest. He said that he suspected that May was engaged in bookmaking, but "didn't delve into the thing," and that thereafter he told Redden and May that he thought the bookmaking was a "bad thing." In his statement to the deputy district attorney defendant denied that he had told May that the police intended to arrest him or that he had advised moving the bookmaking enterprise to a new location or that he had ever discussed police protection with Redden or May.

At the trial defendant testified on his own behalf. The substance of his testimony is similar to that of his statement

to the deputy district attorney. He denied any connection with bookmaking or bribery.

The following evidence corroborates the testimony of May and Redden: Although defendant denied the testimony that he "tipped off" Redden and May that May should suspend operations because the police planned to raid the bookmaking establishment, defendant testified that at about the time of the asserted "tip-off" he had read in the paper that May was on probation for a previous conviction of bookmaking and that there were numerous investigations and raids of bookmakers in progress; he telephoned Redden and thereafter met with Redden and May and told them that "the man should certainly get out of the [bookmaking] business . . . because he certainly would get caught, probably without any lapse of time at all." A sheriff's officer testified that at the time of the asserted "tip-off" he did give the Oakland police a report on May's activities. An Oakland police captain testified that he received the report and gave it to the lieutenant who, according to May and Redden, had been named by defendant as the person with whom he arranged for protection. Defendant was acquainted with several ranking members of the Alameda police department, including the above mentioned lieutenant.

Defendant admitted that he was receiving payments from May and his explanation thereof was rather peculiar; i.e., although defendant's cash resources were very modest he had made an unsecured loan of cash to May, whom he had not previously known, merely upon Redden's assurance that May was "all right"; the loan was not evidenced by any writing; defendant stated on one occasion that he made no record of the amounts repaid on the loan and testified that on a few occasions he noted a payment on a calendar but kept no "methodical record" of payments.

On the afternoon of January 12, 1951, after May's arrest, Redden made three telephone calls to defendant's wife in an effort to reach defendant; she told Redden that defendant would be at a hotel in Sacramento that evening; Redden left a message at the hotel and shortly after defendant arrived there he returned the call and Redden told him that May had been arrested and had made statements implicating defendant and Redden. At 1:39 a. m. on January 13th defendant, at the Sacramento hotel, received a telephone call from "Mr. Smith" at a pay station in Oakland. The police lieutenant got off duty just after 12 o'clock midnight. Defendant testified that a

"Willie Smith" had previously asked defendant to get him a job and that "Smith" telephoned to inform defendant that he was leaving Oakland for Los Angeles.

Redden and May, according to their own testimony, were principals in each of the charged offenses of bookmaking (counts two and three); May directly committed the acts constituting those offenses and Redden advised and encouraged their commission. (Pen. Code, § 31.) Since they are accomplices and are liable to prosecution for the identical offenses charged against defendant in counts two and three, their testimonies must be corroborated by other evidence tending to connect defendant with the commission of such offenses. (Pen. Code, § 1111.) Defendant urges that there is no such corroboration. The evidence above summarized is sufficient for that purpose. The corroborative evidence may be slight and entitled to little consideration when standing alone. (*People* v. *Harper* (1945), 25 Cal.2d 862, 876 [156 P.2d 249]; *People* v. *Trujillo* (1948), 32 Cal.2d 105, 111 [194 P.2d 681].) "The evidence of inculpatory participation need not be direct nor extend to every fact and detail. It may be circumstantial and is sufficient, even though slight, if it tend to connect the defendant with the commission of the crime. [Citations.]" (*People* v. *Henderson* (1949), 34 Cal.2d 340, 343 [209 P.2d 785].) Defendant's association with police officials on the one hand and with Redden and May on the other hand, his peculiar explanation of his relations and dealings with the latter and his reason for receiving payments from them, his admitted knowledge that May was a bookmaker and that he advised May to abandon that enterprise, all tend to connect him with the commission of the bookmaking offenses.

Defendant insists that his explanation, in his extrajudicial statement to the deputy district attorney and in his testimony, of his claimed loan to May, "fantastic though it may be," does not supply corroborative evidence tending to connect defendant with the commission of the crimes. The theory upon which such evidence may be given probative effect is that the triers of fact could conclude that it was knowingly false and could further conclude that the intentional making of extra judicial and testimonial false explanations indicates a consciousness of guilt. No California case discussing this matter has been cited by the parties or discovered by our research.

The People rely upon *Boston* v. *Santosuosso* (1940), 307
Mass. 302, 349 [30 N.E.2d 278], and *Sheehan* v. *Goriansky*
(1944), 317 Mass. 10, 16 [56 N.E.2d 883]. ■ We agree
with the following reasoning of the Santosuosso case: "Of
course, as has been pointed out many times, disbelief of evi-
dence is not the equivalent of affirmative evidence to the con-
trary. [For example, in *Zarrillo* v. *Stone* (1945), 317 Mass.
510, 512 [58 N.E.2d 848], an action for personal injuries,
Justice Wilkins, who also wrote the Sheehan opinion, pointed
out that disbelief of-defendant's testimony to the effect that
he was not negligent could not supply proof that he was
negligent.] But where a material fact is established by evi-
dence and it is shown that a defendant's testimony as to that
fact was wilfully untrue, this circumstance not only furnishes
a ground for disbelieving other testimony of this defendant
[citations], but also tends to show consciousness of guilt or
liability on his part and has probative force in connection
with other evidence on the issue of such guilt or liability.
Such false testimony is in the nature of an admission from
which with other evidence guilt or liability may be inferred.
[Citations.]"

■ It should be emphasized that no inference of con-
sciousness of guilt can be drawn from the mere fact that the
jury, in order to convict, must have disbelieved defendant's
explanation of his relationship with May and Redden; only
where the false statement or testimony is intentional rather
than merely mistaken and where such statement or testimony
suggests that defendant has no true exculpatory explanation
can it be considered as an admission of guilt. (See con-
curring opinion of Justice Traynor in *People* v. *Albertson*
(1944), 23 Cal.2d 550, 581-582 [145 P.2d 7]; *State* v. *Elsberg*
(1941), 209 Minn. 167, 177 [295 N.W. 913].) Here defendant
did not simply deny his guilt; he ventured upon an explana-
tion so unusual that the triers of fact could conclude that it
was an intentional fabrication indicating consciousness of
guilt and the absence of any true exculpatory explanation.

■ Defendant asserts that the instructions on the sub-
jects of liability for the actions of coconspirators in further-
ance of the criminal design and of corroboration of accom-
plices are erroneous and confusing. The trial court gave
correct general instructions on these subjects. However,
defendant says that the following instructions are conflicting:
The court first told the jury that "Whether or not any witness
in this case was an accomplice, as defined in these instruc-

tions, is for the jury to determine from all the testimony." The court then told the jury that if there was a violation of section 653f Redden as a matter of law was an accomplice, and that if there were violations of section 337a May and Redden as a matter of law were accomplices. The jury presumably followed the direction that they determine who was an accomplice "as defined in these instructions" and was not misled by the further instructions which not merely defined but also named accomplices.

As previously stated, count one alleges that defendant solicited May to offer and join in the offering of a bribe to police officials. Section 653f of the Penal Code provides for the punishment of "Every person who solicits another to offer or accept or join in the offer or acceptance of a bribe, or to commit or join in the commission of" other crimes not material here. The section further provides, "Such offense must be proved by the testimony of two witnesses, or of one witness and corroborating circumstances."

■ Defendant argues that there is no evidence whatsoever, even in the testimony of Redden and May, that defendant solicited May; rather, he says, the prosecution evidence, if believed, establishes that the solicitation was by May and Redden. The evidence shows more than this; it could be inferred that after the original solicitation of defendant and after defendant interviewed or purported to interview the police he, in turn, solicited May to offer a bribe on the particular terms arranged.[1]

■ Defendant further argues (assuming that the testimony of May and Redden could be viewed in such a light that they would tend to show that, after the original solicitation by May and Redden, defendant solicited May) that May as well as Redden was an accomplice, "liable to prosecution for the identical offense [of solicitation, as well as the above discussed offenses of bookmaking,] charged against the defendant

---

[1]May testified that at his first meeting with defendant (which, as stated, was after Redden had first told defendant of May's desire to operate a bookmaking business without police interference) May told defendant that he wished to be "insured of protection" and defendant replied that "he could insure me against [sic] protection," that it "would cost me $200 a week," and that certain methods of operation must be complied with.

Redden testified that at this first meeting "Mr. Wayne told Mr. May that . . . he would go along with 20 percent of the net, and that money was to be spent to take care of his police protection," suggested that the payments be delivered from May to himself by Redden, and that "he would contact them [the police] . . . and see if May's location and everything was all right."

on trial in the cause in which the testimony of the accomplice is given'' (Pen. Code, § 111). The trial court, on the other hand, instructed the jury that under section 653f of the Penal Code the person solicited is not an accomplice. This would be true if the evidence showed only that defendant solicited such person and nothing more. (*People* v. *Baskins* (1946), 72 Cal.App.2d 728, 731 [165 P.2d 510]; *People* v. *Haley* (1951), 102 Cal.App.2d 159, 165 [227 P.2d 48]; see, also, *People* v. *Brown* (1923), 61 Cal.App. 748, 752-753 [216 P. 58]; *People* v. *Montgomery* (1941), 47 Cal.App.2d 1, 10 [117 P.2d 437].) The prosecution evidence, however, shows much more than that; May was not merely a participant in the criminal scheme but the instigator of such scheme. Nevertheless, the People urge, as to the offense charged in count one he could not be an accomplice whose testimony must be corroborated pursuant to section 1111, because he could not conspire to solicit himself. ▇ The People correctly state that ''It is essential for the crime of solicitation defined in section 653f of the Penal Code that two or more persons must necessarily be involved. At least one person must necessarily be a solicitor and the other person must necessarily be the person solicited.'' ▇ But it does not follow, as they further state, that ''To have both parties approach the crime from the same direction, i.e., as solicitors, would result in the commission of no crime.'' Where, as here, May first solicited Wayne in general terms and thereafter Wayne solicited May to join in the offer of a bribe on specific terms, there are two criminal solicitations rather than ''no crime.'' ▇ Furthermore, May, by his original solicitation of Wayne, together with his ensuing conduct, encouraged and abetted Wayne's subsequent more specific solicitation and thus became a principal in the latter crime under the provision of section 31 of the Penal Code that ''All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed.''

The situation here is similar to that in *People* v. *Wallin* (1948), 32 Cal.2d 803, 806-807 [197 P.2d 734]. The crime charged in the Wallin case was the violation of section 32 of the Penal Code, which provides that ''Every person who, after a felony has been committed, . . . *aids a principal* in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, . . . is an

accessory to such felony.'' (Italics added.) Liability for being an accessory, like liability for solicitation, cannot be incurred by one person acting alone; to constitute a violation of section 32 there must be a principal and an aider, acting in concert. In the Wallin case the People contended that a murderer ''could not be an accessory after the fact to her crime and that therefore she was incapable of committing the offense with which defendant stands charged.'' This court replied, ''It may be that a murderer who acts alone in concealing her crime cannot be separately charged as an accessory, but it does not follow that she cannot become liable as such if she encourages another to aid her in avoiding arrest and punishment. There are many instances in the law where a person is held to be criminally responsible for cooperating in an offense which he is incapable of committing alone.'' For example, a female can be guilty of rape (*People* v. *Bartol* (1914), 24 Cal.App. 659, 661 [142 P. 510] or pimping (*People* v. *Young* (1933), 132 Cal.App. 770 [23 P.2d 524]) if she aids and abets a male in the commission of such crimes, even though because of her sex she could not herself commit them. And although a person cannot commit incest or sodomy with himself, a witness who has participated in those crimes voluntarily and with knowledge of the wrongfulness of his act is an accomplice whose testimony must be corroborated. (*People* v. *Adinolfi* (1930), 106 Cal.App. 261, 262 [289 P. 176]; *People* v. *Singh* (1932), 121 Cal.App. 107, 109 [8 P.2d 898].)

 We conclude that, by analogy to the cases last cited, and to *People* v. *Lima* (1944), 25 Cal.2d 573, 579 [154 P.2d 698], May could be found to be an accomplice, liable to prosecution for the offense charged in count one, not because he solicited himself but because he actively encouraged and abetted defendant to solicit him. (*Cf. People* v. *Brown* (1923), *supra,* 61 Cal.App. 748, 752-753; *People* v. *Montgomery* (1941), *supra,* 47 Cal.App.2d 1, 10-11; *People* v. *Baskins* (1946), *supra,* 72 Cal.App.2d 728, 731; *People* v. *Haley* (1951), *supra,* 102 Cal.App.2d 159, 165, in each of which cases there was no active participation in solicitation or procurement, but at most, as in the Brown and Montgomery cases, mere willing compliance.)

 Although the person solicited, in some cases, may be found to be an accomplice, it appears that in the circumstances of this case the giving of the instruction to the contrary was not prejudicial, for the verdict of the jury

as to counts two and three indicates that they believed the testimony of the accomplices, May and Redden, and the evidence of corroborating circumstances; such evidence in this case necessarily supports a verdict of guilty as to count one also.

The People assert that the holding that May could be an accomplice as to count one will cast doubt upon the holdings of *People* v. *Clapp* (1944), 24 Cal.2d 835 [151 P.2d 237], and *People* v. *Wilson* (1944), 25 Cal.2d 341 [153 P.2d 720]. Those cases hold that a woman who solicits and encourages the commission of a criminal abortion upon herself is not an accomplice of the abortionist, because (p. 838 of 24 Cal.2d) "If a statutory provision so defines a crime that the participation of two or more persons is necessary for its commission, but prescribes punishment for the acts of certain participants only,[2] and another statutory provision prescribes punishment for the acts of participants not subject to the first provision,[3] it is clear that the latter are criminally liable only under the specific provision relating to their participation in the criminal transaction. The specific provision making the acts of participation in the transaction a separate offense supersedes the general provision in section 31 of the Penal Code[4] that such acts subject the participant in the crime of the accused to prosecution for its commission."

The decisions concerning abortions are not controlling here. ▮▮▮ Section 653f of the Penal Code provides for the punishment of "Every person who solicits another to offer or accept or join in the offer or acceptance of a bribe"; there is no separate statutory provision specifically prescribing punishment for criminal participation, if any, by the person referred to as "another" in section 653f; if he is liable to prosecution and punishment for participation in the violation

---

[2]Pen. Code, § 274: "*Every person who . . . administers* to any woman . . . , *or uses* or employs any . . . means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable . . ." (Italics added.)

[3]Pen. Code, § 275: "*Every woman who solicits* of any person any . . . substance whatever, *and takes* the same, *or who submits* to any . . . means whatever, with intent thereby to procure a miscarriage, unless the same is necessary to preserve her life, is punishable . . ." (Italics added.)

[4]Pen. Code, § 31: "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed."

of section 653f it is only because his conduct has made him liable as a principal under section 31 of the Penal Code.[4] (Of course, the person solicited might have proceeded to directly commit or indirectly join in the commission of the offense solicited, in which case he would be punishable for that offense (*People* v. *Harper* (1945), *supra*, 25 Cal.2d 862, 877]; however, the question of the effect of section 653f as the counterpart of section 275 in such a situation is not before us, for the prosecution has not seen fit to charge that a bribe was actually offered.)

The court instructed the jury that the corroborating circumstances required by section 653f of the Penal Code need only tend to establish the commission of the crime by someone, and need not connect the defendant with the commission of the crime. The analogous provision of section 1103a, which requires proof of corroborating circumstances to establish perjury, has been held to require corroboration which tends to connect defendant with the crime. (*People* v. *Woodcock* (1921), 52 Cal.App. 412, 417 [199 P. 565]; *People* v. *Follette* (1925), 74 Cal.App. 178, 204 [240 P. 502]; see, also, *People* v. *Wilson* (1944), *supra*, 25 Cal.2d 341, 346-347, which mentions but does not decide the question whether the corroboration of the woman's testimony required by section 1108 of the Penal Code in an action for seduction of a minor or abortion need connect the defendant with the crime.) ▮ Although the corroboration required by section 653f should tend to connect defendant with the crime, the instruction to the contrary did not harm defendant here, for the verdicts as to counts two and three necessarily imply a finding that the corroborative evidence was true and did tend to connect defendant with the criminal enterprise of which each of the offenses charged in the three counts was a part.

Defendant contends that the prosecuting attorney was guilty of prejudicial misconduct in several respects. ▮ The asserted facts that Redden and May were given short jail sentences and that two other persons who, according to the testimony herein, were involved in the bookmaking operations were not prosecuted, cannot, without more, affect the propriety of defendant's conviction.

▮ In the course of argument the prosecuting attorney said, "keep in mind that at the Grand Jury hearing they heard Joe May and other witnesses testify. Mr. Wayne himself was offered an opportunity to personally testify at that time, but refused on the ground that he might incriminate

himself; and the indictment was returned by a responsible group of citizens who believed the evidence showed that Wayne had committed the crimes charged.'' Defendant's counsel objected to the reference to what the grand jurors believed but did not ask that the jury be admonished. The court said merely, ''Proceed.'' Defendant complains that the remark that the grand jury ''believed the evidence showed that Wayne had committed the crimes charged'' constituted misconduct, and that the effect of such misconduct was not removed by the prosecuting attorney's further statement and the trial court's instruction that the indictment was not evidence and raised no presumption of guilt. The People urge that the quoted argument was not prejudicial misconduct but was in reply to defense counsel's statement that ''once you are accused, as far as the public is concerned, they think you are guilty until you sit in a court room like this, as you ladies and gentlemen are, and you hear the truth.'' The argument was not responsive to the statement of defendant's counsel. The prosecuting attorney's comment as to what the grand jury believed was improper (*People* v. *Edgar* (1917), 34 Cal.App. 459, 467 [167 P. 891]; *People* v. *Hale* (1947), 82 Cal.App.2d 827, 833 [187 P.2d 121]) and in any reasonably close case could well require reversal of the judgment, but the conduct here was less serious than that considered in the Edgar and Hale cases; it was not particularly emphasized; and we conclude that on the record here it did not result in a miscarriage of justice.

On cross-examination defendant had testified, without objection, that he had appeared before the grand jury and, although he wished to testify there, upon advice of his counsel he refused to do so on the ground that he might incriminate himself. As appears above, the prosecuting attorney, briefly and without objection specifically directed to this particular matter, referred in argument to defendant's invocation of the privilege against self-incrimination. Defendant's counsel on appeal (who is not the counsel who tried the case) urges that the prosecuting attorney, by educing the testimony as to and commenting on defendant's failure to testify before the grand jury, destroyed his constitutional privilege to decline to answer on the ground that he might incriminate himself. If we consider this contention despite the lack of objection in the trial court, it is answered by *People* v. *Kynette* (1940), 15 Cal.2d 731, 750 [104 P.2d 794]. Defendants there, like defendant here, invoked the privilege

against self-incrimination before the grand jury but at the trial took the stand and testified to their innocence and to exculpatory explanations of incriminating circumstances. It was held that "the use solely for impeachment purposes of a defendant's prior refusal to testify before a grand jury because of fear of self-incrimination, no more destroys that constitutional privilege than does the right to comment upon and consider a defendant's failure to explain evidence against him tend to destroy his equally valuable constitutional right to refuse to be a witness against himself." Other references of the prosecuting attorney to the grand jury were simply statements that it had indicted defendant and Redden and were not improper.

Defendant makes a number of general assignments of error, unsupported by argument or authority. ▮ He says that the trial court erred in admitting evidence of his extrajudicial statement, made under questioning by an assistant district attorney, because the corpus delecti had not been established. (See *People* v. *Quarez* (1925), 196 Cal. 404, 409 [238 P. 363].) Defendant is mistaken. The corpus delecti of each count was established by the testimony of Redden and May; the corpus delecti of the bookmaking counts was further established by the testimony of the officers who raided the bookmaking establishment. ▮ Defendant further urges that his extrajudicial statement should not have been received because it did not corroborate the testimony of Redden and May. The statement contained relevant admissions, not necessarily incriminating in themselves, that defendant had associated with, warned, and received payments from May and Redden, as well as the relevant and damagingly peculiar explanation of the circumstances of the asserted loan to May. ▮ Insofar as the statement contained protestations of innocence its admission could not have harmed defendant.

Defendant's contention that the court should not have received any evidence as to the bookmaking activities of May and Redden is manifestly without merit.

▮ To show that he could not have been present at a conspiratorial meeting on November 28, 1950, defendant introduced the testimony of his mother-in-law, Mrs. Kiester, and of a roomer in Mrs. Kiester's home, Mr. Saucke. In rebuttal the People introduced evidence that these witnesses had lived together as man and wife. The trial court instructed the jury that this evidence was admitted only as tending to show bias on the part of Saucke and not as evidence against

defendant. Defendant complains that it was prejudicial error to admit the evidence and that the instruction emphasized the prejudice. Such evidence was admissible, despite the fact that it tended to show an unconventional relation, because it might be inferred that it bore on the interest of Saucke in testifying favorably to defendant. (*People* v. *Gould* (1952), 111 Cal.App.2d 1, 6 [243 P.2d 809].) The instruction correctly limited the effect of the evidence and did not, as defendant asserts, improperly emphasize its prejudicial effect.

Defendant contends that the court erred in refusing to permit Mrs. Kiester to testify as to who was present at the time for which she gave him the alibi. The transcript discloses that she did testify as to who was present. ▮ Defendant further contends that the trial court erred in refusing to permit Mrs. Kiester to answer the question, ''When was the date of November 28th first discussed?'' The reason for this question was as follows: The People had brought out that defendant had been previously tried for the offenses and at that trial had not produced the alibi; defendant wished to show the circumstances under which the witnesses Kiester and Saucke, before the second trial, learned of the importance of the date and recalled it to defendant's attention. There is testimony of defendant and Saucke as to the circumstances which refreshed defendant's recollection as to the date, and any testimony of Mrs. Kiester would have been cumulative.

▮ Defendant asserts that the court erred in admitting testimony showing defendant's connection with slot machines, since such testimony inflamed and prejudiced the jury. Defendant himself testified that he was an electronics engineer and that he had been retained to service the slot machines at an officers' club in Alameda. It was through this work at the club that he met Redden and also a number of members of the police department. Defendant's counsel referred to this matter in oral argument. Certainly there was nothing inflammatory in letting the jury know that defendant had had part-time occupation repairing slot machines at a time when the presence of the machines in the officers' club on federal property was legal. There was testimony (including the testimony of defendant himself on cross-examination) which showed that he arranged to obtain a slot machine for a member of the police department. This testimony was relevant to show defendant's relation to the police department; indeed, according to the testimony of other witnesses defendant had admitted giving the machine to the officer under

circumstances which might have indicated that it was in part payment for "protection."

Defendant claims that his trial was unfair because the public and the jury were aroused by newspaper and radio accounts of this case and of official investigations of similar cases in this and other states. This matter was not raised before the trial court and is without support in the record.

For the reasons above stated the judgment and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.