[Crim. No. 5340. Second Dist., Div. Three. Sept. 27, 1955.]

THE PEOPLE, Respondent, v. LEROY B. MALOUF, Appellant.

Stanton & Stanton and Louis B. Stanton for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was charged with receiving stolen property, 188 diamonds, in violation of section 496 of the Penal Code. Trial by jury was waived. He was adjudged guilty. Proceedings were suspended, and probation was granted on condition that appellant spend six months in the county jail. He appeals from the order denying his motion for a new trial, and from the order granting probation.

Appellant contends that the evidence was insufficient to support the finding of guilt; that the court erred (1) in receiving evidence of extrajudicial statements of defendant, and (2) in receiving in evidence certain pliers and photographs.

On March 3, 1954, between 6 and 11 p. m., a diamond necklace was stolen from the home of Mrs. Simmons in Los Angeles.

At noon on March 4, 1954, defendant went to Stillano's pawnshop in Monrovia to redeem something he had pawned, and he asked Stillano if he would be interested in buying some diamonds. Stillano replied that it would depend on the amount. Defendant said that he had some diamonds that were left to him by his father. Stillano said he would be glad to look at them. At 3:20 p. m. of that day defendant returned with 10 loose single-cut diamonds of a total weight of 25/100 of a carat, which Stillano purchased for $20. Defendant said that he had more that were left to him by his father, who had been in the loan or pawn business. On March 26, 1954, defendant went to Stillano's shop with a parcel of diamonds that weighed from 12 to 15 carats. Stillano testified that he could not give an estimate of the number of diamonds in the package, but there were many more than 25 in it. Defendant asked Stillano if he wanted to buy them. Stillano picked out seven diamonds, which weighed 4.47 carats, and he asked defendant how much he wanted. When defendant did not commit himself, Stillano offered him $300. Defendant said he would take it, and then Stillano gave him

$300 in cash. Stillano testified that the price was fair and reasonable. Stillano made a record of the transaction in a book, and defendant signed it. Then Stillano referred defendant to Artunian, a jeweler in Los Angeles.

Peter Artunian testified that the first time he saw defendant was on Friday, March 26, 1954, when defendant came into his jewelry store at 216 South Spring Street, Los Angeles. Defendant said that he was LeRoy Malouf, that he had been sent there by Stillano, and he had some diamonds that he would like to sell. They were small diamonds in regular diamond paper. He offered defendant $840 for them. He paid $140 to defendant and gave him an "IOU" for $700 to. be paid on the following Monday. After giving the $140 and the "IOU" to defendant, Artunian took the $140 back and told defendant that he might as well trust him for "the whole thing." When defendant returned on Monday, Artunian gave the diamonds to him and took the "IOU" back, because Artunian did not have a second-hand license. He thought he would have such a license on Tuesday, and he was going to buy the diamonds then. Defendant told him something about the diamonds coming from his father's estate. On that Monday or the next day, defendant left some diamonds there to be used by Artunian in making a half-inch-wide ring for defendant's fiancée. On Tuesday defendant brought in some more, or a second package of, diamonds which he wanted to sell. They picked some diamonds from that lot to add to the ring. The diamonds, other than those to be used for the ring, weighed 32 or 33 carats. He offered to buy them for $1,200, and defendant said that was all right and he would take it. Artunian told him that he would try to get more money for the diamonds at some other place, and defendant told him to do the best he could. Artunian gave him a check for $100. (The check was paid by the bank on that Tuesday.) They agreed that defendant would return on Friday. When Artunian made the arrangement for defendant to return on Friday, he was acting under instructions of the police. After that Tuesday (and before Friday) Artunian took the diamonds to Mr. Dessy, a diamond broker. (Mr. Dessy had sold the diamond necklace to Mr. Laykin, a jeweler, who had sold the necklace to Mrs. Simmons.) Also in the meantime (preceding Friday) Artunian talked to Officers Brown and Hausman of the police department. On Friday, Artunian told defendant that he did not have the money for him but he would have it on Monday.

On Monday, Artunian told him to come back on Tuesday. On Tuesday when defendant came in, Artunian told him that they would take the diamonds some place and show them to someone who was interested. At that time the diamonds were in a regular diamond paper in an envelope. Artunian told him to take the diamonds, and he took them. They left the store and defendant was arrested by Officer Brown.

Officer Brown testified that he arrested defendant on April 6 just outside Artunian's store, and at that time Artunian was with defendant. From the person of defendant, the officer took an envelope containing numerous diamonds. He had a conversation with defendant regarding the diamonds.

When the officer was asked to relate the conversation he had with defendant, counsel for defendant objected upon the ground that the corpus delicti had not been established. The objection was overruled. Then the officer testified that he asked defendant where he had obtained the diamonds he was carrying. He replied that they did not belong to him, that they were Artunian's and he was carrying them for him. He also said that his only connection with Artunian was that he was having a ring made by Artunian. The officer told defendant that they (officers) knew that he had taken the diamonds to Artunian several days before, that Artunian had offered to pay him about $40 a carat and he had received $100, that he had returned to Artunian's office several times to collect the money, and that he offered to take other diamonds there for sale. Defendant stated that was true; that he had brought those diamonds in for sale to Artunian. The officer showed to defendant a copy of the burglary report, in which Mrs. Simmons had reported a burglary, and he told defendant that they identified the diamonds he was carrying as being from a necklace that was taken in that burglary. Defendant stated that he knew nothing about the burglary, that he had made a legitimate purchase of approximately $1,200 and if necessary he would produce a bill of sale. When the officer asked him to tell from whom he had purchased the diamonds, he replied that he could not tell at that time. Defendant's car was in a parking lot near Artunian's store. Officer Brown went with defendant in that car to the place where defendant lived, and the other officer followed them in the police car. Later that day, when the officers searched defendant's car they found three pairs of pliers in the glove compartment. In response to questions by the officers, defendant said that the pliers were his and that he used them

to work on things. The pliers were delivered to Officer Kearney of the crime laboratory on April 6. Also on that day, in response to questions by the officers, he said that he had sold several diamonds to Stillano in Monrovia for $300 and that those diamonds were left to him by his father who had passed away. They went to Stillano's store and the diamonds, which defendant had sold there, were shown to him. Officer Brown called attention to the fact that those diamonds were the same color and odd cut as the diamonds defendant was carrying when arrested, and asked him if it was not true that the diamonds at Stillano's came from the same source rather than from his father. Defendant replied that they had. While returning to the police station, the officer asked defendant if he wanted to tell them where he bought the diamonds, and he replied that it was a legitimate purchase but he could not tell at that time. In one of the conversations on the day of the arrest defendant said that he wanted to cooperate with the officers and since he knew from what they had told him that the jewels had been stolen, he wanted to make every effort to contact the man from whom he had obtained them, and to assist in recovering the rest of the diamonds. He also said that if he were booked under his true name and the matter of his arrest should get in the newspapers he might lose contact with the man from whom he obtained the diamonds. For that reason the officers booked him under the name of John C. Alexander. On the day after the arrest and in the presence of Officer Brown at the police station, defendant made a telephone call in an attempt, according to defendant, to reach the man from whom he had obtained the diamonds. After that call he said that the switchboard operator was going to leave a message for the man to call back. In a few minutes he received a telephone call and he had a conversation with someone. Shortly thereafter he told the officers that he had an appointment to meet the man, and then defendant left. Later defendant returned and said that the man had shown up at the spot where he was supposed to meet him and asked that they go to another spot because he did not like the place where they were; and defendant said further that when they left to go to the other spot they became separated and he had not been able to contact the man. On April 15, in a conversation with the officers, defendant stated that he had obtained the diamonds in Las Vegas about March 10 from a man who gave the name of Ray Edwards; he had not met the man previously and they

gambled together for a short time; he had lent $1,200 to Edwards and had accepted the diamonds as security; Edwards told him that he lived in Los Angeles and acted as a stunt man in motion pictures, and that defendant could contact him in Los Angeles and he would return the $1,200. Defendant said that he had returned to Los Angeles about March 12 and checked into a motel (specifically mentioned) and had lived there about 15 days. The officers had all the telephone numbers which defendant had called from there, but the Crestview number which defendant gave them was not on the list. When the officers asked him what his explanation of that was, he said he might have placed the calls from some place besides his room. The officer told defendant that they had made a check from every source available to them and they could not locate Ray Edwards in California and they found no record of a Ray Edwards who acted as a a stunt man in motion pictures in Hollywood; and that the Crestview number which defendant had given them was a number in a telephone booth on a street corner. Defendant said that he had no explanation of that. The officers in Los Angeles were told by officers in Nevada that defendant was in Nevada about the time he said he was there.

Officer Kearney, a forensic chemist in the scientific investigation division of the police department, testified that he made microscopic examinations of the cutting edges and surfaces of the three pliers (which were found in defendant's car). He also made microphotographs of the edges and surfaces, and removed material therefrom and made spectrographic analyses of it. On the cutting edges of one of the pliers he found gold, platinum and silver. On the cutting edges of another of the pliers he found gold and silver. The other pliers are known as needle-nosed pliers, and on the indented portion of the jaws thereof (extending about half an inch back from the tip) he found gold and silver.

Mr. Dessy, a diamond broker for 29 years, testified that he sold a diamond necklace to Mr. Laykin on consignment in November, 1953, for $17,875. He (Dessy) had owned the necklace nine years before that time. He bought it in New York from his brother, who told him that it was made in Europe. There were 410 diamonds in it. He (witness) looked at the necklace many times while he owned it, and on several occasions he took diamonds out it it, tried to recut them, and then put them back in the necklace. The diamonds weighed about 100 carats. He recognized certain diamonds,

which were exhibits, as diamonds that had been in the necklace which he owned, and he described them as follows: One of them is a very rare size and a very rare color—pink brown; another is very rare, olive color with imperfections—a cut on the table (or top) of it and a "feather" on the side; one of amber color; one of fancy canary color, apparently flawless; one of gold color, imperfect with a feather on table; one of canary color, with black imperfection and feather; three yellow diamonds; a pair of coffee-colored diamonds—a combination which is hard to find; a baguette diamond, olive color; six pear-shaped diamonds, commercial white. He would say that several other diamonds, smaller ones (which are exhibits), look to him as if they were in the necklace. In his opinion the market value of 65 of the diamonds (exhibits, which were in possession of defendant at time of arrest), which weighed 22.71 carats, was $1,500 to $1,600. The setting or base of the necklace was platinum. There is a difference in the physical makeup of European platinum and American platinum used in rings and necklaces. Usually platinum that is used in America in the makeup of necklaces contains 10 per cent iridium. Sometimes in Europe they use 10 or 15 per cent "finer gold, white gold." In his opinion the market value of the seven stones sold to Stillano (for $300) was approximately $730.

Mr. Laykin testified that he has been in the jewelry business about 30 years, and during the past 15 years he has been with I. Magnin and Company. In December, 1953, at Magnin's he sold a diamond necklace to Mrs. Simmons for $23,500 (including 23 per cent tax). In his opinion that was an extremely low price for it. He had the necklace on consignment from Mr. Dessy until it was sold. He had it ten days or two weeks. He paid Mr. Dessy $16,500 or $17,000 for it (with no tax). He studied the makeup of the necklace and he was somewhat familiar with the stones in it. The necklace contained fancy colored diamonds, very unusual colors and shapes—an unusual blending of colors, ranging from light browns to dark browns and canary colors. One of the diamonds (an exhibit) was in the necklace he sold to Mrs. Simmons. That diamond is an extremely unusual shape—very long and very narrow and is the only one that he has seen of that shape and color. He could remember it by reason of its unusual shape. Four other diamonds (exhibits) "look as if they could have been in the necklace"—they are the size, color and quality of ones that were in the necklace. He

believed that the seven diamonds (Exhibits 14 and 15) which Stillano bought (for $300) resembled the stones in the necklace.

Mr. Bold, called as a witness by defendant, testified that he has been a jeweler and diamond broker for 22 years. In his opinion the diamonds purchased by Artunian had a maximum value of $1,200, and if that lot of diamonds had been offered to him for $1,000 he would have declined the offer because it is merchandise that is very badly imperfect. He would say that the diamonds, except one (or except one box of diamonds) were reject merchandise of the poorest quality.

Mr. Solomon, called as a witness by defendant, testified that he has been a wholesale jeweler since 1943. His opinion as to the market value of the diamonds in evidence would correspond with the testimony of Mr. Bold. He would say the value of the diamonds would be about $1,300—about $45 or $43 a carat.

Defendant did not testify.

Appellant contends that there was no evidence that he received any diamonds, or withheld any diamonds from the owners, knowing that they had been obtained by theft.

The first question under such contention is whether the diamonds were stolen. There was evidence that on March 3, 1954, in the nighttime, a diamond necklace which was owned by Mrs. Simmons was removed from her home by an unknown person without her knowledge or permission. That evidence supports a finding that the necklace was stolen. There was evidence (testimony of Dessy and Laykin) that some of the diamonds, in the possession of defendant at the time of his arrest, had been in the necklace. Also there was testimony by them that several of the other diamonds then in his possession "looked" as if they had been in the necklace. Also there was testimony by Mr. Laykin that the seven diamonds sold to Stillano resembled the stones that were in the necklace. That evidence was sufficient to support a finding that many of the diamonds involved in the transaction with Artunian, and the diamonds in the $300-transaction with Stillano, had been in the necklace which had been stolen. It could be inferred from that evidence that the diamonds involved in those transactions were stolen. It was not necessary to prove that defendant received all the diamonds (188) which it was alleged, in the information, that he had received. (*People* v. *Fitzpatrick*, 80 Cal. 538, 541 [22 P. 215].) It appears

therefore that it was established that the diamonds which were sold to Stillano for $300 and the diamonds which were in the possession of defendant at the time of his arrest were stolen.

The next question under such contention is whether the evidence was sufficient to support a finding that defendant knew that the diamonds were stolen. Extrajudicial statements of defendant were not admissible unless the People established the corpus delicti by evidence independent of such statements. In *People* v. *Cullen,* 37 Cal.2d 614 [234 P.2d 1], it was said at page 624: "It is the settled rule, however, that the corpus delicti must be established independently of admissions of the defendant. Conviction cannot be had on his extrajudicial admissions or confessions without proof *aliunde* of the corpus delicti; but full proof of the body of the crime, sufficient to convince the jury of its conclusive character, is not necessary before the admissions may be received." ■ A prima facie showing that the diamonds were received with knowledge that they were stolen is all that is required as a foundation for the introduction in evidence of extrajudicial statements of defendant; and the order of proof is discretionary. (See *People* v. *Cullen, supra,* 624-625.) Defendant was in possession of stolen diamonds when arrested. ■ Possession of stolen property, accompanied by suspicious circumstances, will justify an inference that the property was received with knowledge that it had been stolen. (*People* v. *Lopez,* 126 Cal.App.2d 274, 278 [271 P.2d 874].) Defendant sold seven diamonds for $300, the price offered by Stillano. There was testimony (by Dessy) that the value of those diamonds was about $730. According to that testimony, defendant sold those diamonds for about one-half their value. ■ A sale of property at a price which is disproportionately low in comparison with the value of the property may be a suspicious circumstance. (See *People* v. *Gould,* 111 Cal.App.2d 1, 7 [243 P.2d 809]; *People* v. *O'Shaughnessy,* 135 Cal.App. 104, 110-111 [26 P.2d 847].) ■ Alteration of stolen property to prevent identification may be a circumstance showing knowledge that the property was stolen. ■ The necklace which was stolen had many diamonds in it, and many of those diamonds had been removed from the necklace. In defendant's car there were three pliers that had gold and silver on their cutting edges; and on one of the pliers there was platinum in addition to gold and silver. The possession of such pliers was a suspicious cir-

cumstance which would support an inference that defendant used them on jewelry. The possession of the pliers on which there was platinum was a suspicious circumstance which would support an inference that defendant used them to remove the diamonds from the platinum necklace. Defendant's possession of loose diamonds, accompanied by such suspicious circumstances above mentioned, established the corpus delicti sufficiently to justify receiving in evidence extrajudicial statements of defendant.

 "[P]ossession of stolen property, accompanied by no explanation, or an unsatisfactory explanation of the possession, or by suspicious circumstances, will justify an inference that the goods were received with knowledge that they had been stolen." (*People* v. *Lopez, supra,* 126 Cal.App.2d 274, 278 [271 P.2d 874].) When Officer Brown asked defendant, at the time of the arrest, where he obtained the diamonds, the defendant gave an evasive and incomplete answer in saying that they belonged to Artunian and he was just carrying them for him. Also he made a false statement when he told the officer that his only connection with Artunian was that he was having a ring made by Artunian. It could be inferred from such reply of defendant that he was attempting to disassociate himself from the diamonds. Also such reply was evidence of consciousness of guilt. On one occasion defendant said he had made a legitimate purchase (of the diamonds) for $1,200 and he would produce a bill of sale if necessary. On another occasion he said he lent $1,200 to Ray Edwards and took the diamonds as security. He did not produce a bill of sale. The Ray Edwards so referred to by defendant could not be located. It could be inferred that defendant's purported attempt to meet Ray Edwards or the man from whom he obtained the diamonds, at a certain place in Los Angeles, was a false token of cooperation with the police. Also, defendant made a false statement to the officers when he told them that the diamonds he sold to Stillano had been left to him by his father. Later, defendant admitted to Officer Brown, as shown hereinabove, that the diamonds he sold to Stillano did not come from his father but came from the same source as the diamonds which he was carrying when he was arrested. The Crestview telephone number which defendant gave to the officers was the number of a telephone in a telephone booth on a street corner; and defendant said he had no explanation regarding that. In view of the evasive, inconsistent, and false statements of defendant, and in view

of his unsatisfactory explanation of his possession of the stolen diamonds, the trial judge could reasonably find that defendant knew that the diamonds were stolen.

Furthermore, the defendant did not testify. It was within his power to deny or explain the evidence against him. His failure to deny or explain such evidence could be considered by the trial judge "as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable." (*People* v. *Adamson*, 27 Cal.2d 478, 488-489 [165 P.2d 3]; *People* v. *Steccone*, 36 Cal.2d 234, 239 [223 P.2d 17].) The court did not err in receiving in evidence the extrajudicial statements of defendant. The evidence was sufficient to support a finding that the defendant knew that the diamonds were stolen. The evidence was sufficient to support the judgment.

■■■ Appellant also contends that the court erred in receiving the pliers in evidence. He argues to the effect that there was no evidence that defendant used the pliers on the necklace or the diamonds; and that the pliers were of no evidentiary value, because there was no platinum on two of them and that the platinum on one of them was not the kind of platinum which was in the necklace—European platinum with 10 per cent white gold in it. There was no evidence that any white gold was in the necklace—the evidence was that sometimes in Europe 10 or 15 per cent white gold was used in platinum. With reference to the necklace being made in Europe, the evidence was that Dessy's brother told Dessy that it was made in Europe. The defendant admitted that the pliers were his and that he used them on things. Since there was gold and silver on all the pliers, and additionally there was platinum on one of them, it could be inferred that he used the pliers on jewelry. Section 1954 of the Code of Civil Procedure provides: "Whenever an object, cognizable by the senses, has such a relation to the fact in dispute as to afford reasonable grounds of belief respecting it, or to make an item in the sum of the evidence, such object may be exhibited to the jury. . . . The admission of such evidence must be regulated by the sound discretion of the court." The pliers were admissible as items in the sum of the evidence. The arguments of defendant pertained more appropriately to the weight of the evidence. The weight to be given such evidence was for the determination of the trier of the facts. It was not error to receive the pliers in evidence.

Appellant also asserts that it was error to receive in evidence photographs of the pliers. The photographs were for illustrative purposes. It was not error to receive them in evidence.

It is not necessary to discuss other arguments presented on appeal, which are addressed to the weight of the evidence.

The order denying the motion for a new trial, and the order granting probation, are affirmed.

Shinn, P. J., and Vallée, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 26, 1955.