[Crim. No. 3289. First Dist., Div. One. Aug. 20, 1957.]

THE PEOPLE, Respondent, v. PLEAS SCAGGS, Appellant.

340

Howard F. McKissick, Jr., Springer & McKissick, Speiser & Williams, Lawrence Speiser and John W. Bussey for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

PETERS, P. J.—By indictment Pleas Scaggs and Emil Jones were charged with receipt of property stolen from Daniel Levin in violation of section 496 of the Penal Code. The two were tried together. The jury acquitted Jones, but found Scaggs guilty as charged. Scaggs' motions for a new trial and for probation were denied.* From the judgment of conviction, and from the order denying his motion for a new trial, Scaggs appeals. The main contention of appellant is that the evidence, as a matter of law, is insufficient, it being contended that the prosecution's chief witness—George Randolph, the confessed thief—was completely discredited and so impeached that his testimony must be disregarded. It is also urged that Randolph was not competent to testify; that the prosecutor was guilty of prejudicial misconduct; that certain prejudicial evidence was erroneously admitted, and that certain instructions should have been given by the trial court.

---

*Scaggs' petition for a writ of habeas corpus to be admitted to bail pending appeal was denied by the Supreme Court—*In re Scaggs,* 47 Cal. 2d 416 [303 P.2d 1009].

The stolen property here involved was a "box" or "package" containing over 1,200 diamonds, costing, at wholesale, about $24,000, and belonging to Daniel Levin, a wholesale dealer in diamonds. The confessed thief was George Randolph, a jeweler and business acquaintance of Levin. Emil Jones, the codefendant, was a part-time chauffeur for Randolph. Scaggs, who owned and operated a hotel in San Francisco, was a friend of Jones and Randolph, and was known to Levin.

Levin testified that he had known and dealt professionally with Randolph since 1948, and that Randolph called at his office in the Phelan Building about once a week. On Saturday, October 1, 1955, shortly after 2 p. m., Randolph visited him in his office. Levin was working on some diamonds and continued to do so while talking to Randolph. At this time there was a package of diamonds in the open safe and another package on the desk.* Several times during the afternoon Levin left Randolph alone in the office, and around 3:30 p. m. Randolph left the office for about 25 minutes. About 4:30 p. m. Levin decided to depart. Randolph was still present. Levin then discovered that a package of diamonds was missing. He and Randolph searched the office, then locked it, and went down to Randolph's automobile, then parked near the front of the building. Jones was in the driver's seat. Levin looked into the car and opened the glove compartment, but the diamonds were not there. Levin stated that Randolph told Jones that Levin was "missing" a "package of diamonds," and that he, Randolph, was going back to Levin's office, and that Jones was to wait. Levin and Randolph then went back to Levin's office, and the police were called.

Officer Wilson, later joined by two other officers, responded to the call. Wilson accompanied Randolph to his car. Wilson asked Jones how long he had been there, and Jones told him for two or three hours, that he had driven Randolph to the Phelan Building at 2 p. m., then drove around until he found a parking space, and had never left the area after that. Shortly thereafter Wilson and one of the other two officers, made a thorough search of Randolph's car, but no gems were found.

George Randolph was the next important witness called by the prosecution. He testified that he had known Levin for about 20 years and Scaggs for about six, and had introduced

---

*The witness referred to a "box" of diamonds and also to a "package" of diamonds. Apparently the terms were used interchangeably.

both Jones and Scaggs to Levin. He admitted that on the afternoon of October 1, 1955, he ''took'' a box of diamonds from Levin's desk without Levin's consent, and then took the box down to Jones, and told him to take the box to his hotel. He testified that he thought he told Jones that jewelry was in the box, and was quite clear that he told Jones that the contents were stolen.

After the police had searched Randolph and his car, Randolph and Jones had dinner together, and Randolph dropped Jones off at Scaggs' hotel where Jones lived, and then drove home to Millbrae. The next day, October 2, 1955, Randolph got the package of gems from Jones, and then drove back to Millbrae, and sorted them.

Randolph testified to an event that he said occurred on October 5th or 6th, but which, if it did occur, probably must have occurred later.* He said that on this occasion Jones and Scaggs arrived at his Millbrae residence. Jones was very excited and did most of the talking. He said to Randolph ''Now, my friend, you got diamonds here . . . Now, I want $8,000 for them. . . . I want $8,000.'' Randolph replied that he didn't have $8,000, and that he didn't think the diamonds were worth that much. Jones then picked up a loaded revolver belonging to Randolph that was lying on the table, removed the cartridges and pointed it at Randolph. Scaggs took the gun away from Jones and told him not to point it at Randolph but ''he sided in with the conversation of Mr. Jones,'' and told Randolph they wanted $8,000; that ''$8,000 isn't much. The newspapers said they were worth $35,000.'' During the conversation Randolph told Scaggs that he ''got,'' that is, ''took them'' from Levin. Jones and Scaggs then left, taking the diamonds and the gun with them.

Between the Millbrae incident and October 17, 1955, Randolph spent several days in the hospital, and also saw Scaggs twice at the latter's hotel. On at least one of these occasions they discussed the value of the diamonds, Randolph stating that they ''haven't got such value,'' and Scaggs stating: ''Yes they have. In the papers it was marked $35,000.'' On October 17, 1955, Scaggs and Randolph flew to Seattle. Scaggs was still in possession of the diamonds. In Seattle they visited three diamond merchants to whom Randolph tried unsuccessfully to sell some of the stones. Randolph, in Scaggs' presence, told one of these dealers that Scaggs was his ''driver,'' and

---

*Randolph was not the only witness confused and uncertain about specific dates. Scaggs had the same difficulty.

that the two had just arrived from New York. After being unsuccessful in selling the gems, Scaggs, in his own name, pawned one of the diamonds to get plane fare back to San Francisco.

On October 20, 1955, Randolph again entered the hospital. He telephoned Scaggs twice in reference to the diamonds, telling him to bring the diamonds to the hospital because he had a buyer. On the 21st Scaggs visited Randolph in the hospital three separate times. He did not have the diamonds with him on the first visit, but had some of them on his second visit. Randolph objected that all the diamonds had not been returned, but Scaggs said that was all he had received, and added that he had been unable to sell them. Later that same day Scaggs returned for a third visit. This time Jones was present. Jones, too, denied knowing that any of the stones were missing from the package that Scaggs had returned. Later Randolph turned the gems thus recovered over to his attorney, who turned them over to the police. Ultimately, about $13,000 out of the $24,000 worth of diamonds stolen were recovered.

Two sons of Randolph also testified to some of the events at the hospital on October 21st. They were only present in their father's room during Scaggs' third visit. They did testify that after Scaggs left the second time there were diamonds in the room, which the attorney removed, and that their father, during the third visit, stated to all that Scaggs and Jones were the ones "who had the diamonds." Scaggs admitted that he had returned a package to Randolph, but said that the latter had given it to him for safe keeping, and that he did not know what the package contained.

We next pick up the story with the testimony of John Johnson, who, in October of 1955, was a jewelry polisher. Johnson had known Scaggs for about 10 years. He testified that, on October 8, 1955, in response to a call from Scaggs, he visited Scaggs at the latter's hotel and that Scaggs told him that "a merchant seaman had left something with him. He wanted me to look at it." Scaggs then went out and returned with Jones who had a vial of diamonds. Scaggs asked the value of the diamonds. Johnson replied that before the stones could be valued they would have to be sorted. Scaggs asked Johnson if he would perform this service for a fee. Johnson agreed to do so and returned the next day (October 9th) and sorted the gems. Johnson asked for his pay and Scaggs told him that "I'd have to wait until he and

his friend made the deal, else I could take a stone. I told him I'd take a stone,'' and did so. Then Scaggs wanted to know if Johnson could get the stones weighed. Johnson said that he would ask his foreman, Steve Lokario. The next day (October 10th) he told Scaggs that Lokario would weigh five or six stones and Scaggs could then estimate the weight of the remainder. Lokario took five or six diamonds with him and Lokario weighed them and Johnson then returned the stones to Scaggs. The latter expressed his appreciation by offering Johnson and Lokario some of the diamonds ''at a good price.'' Johnson did not have the funds to take advantage of the offer, but Lokario was interested. Johnson then selected 12 or 15 ''baguettes,'' totaling about two carats, and delivered them to Lokario who paid Scaggs $150 for them. This was October the 18th. Scaggs then again asked Johnson if Lokario could get the stones weighed and, upon Johnson asking Lokario, the latter agreed to take some of the stones out of town and get them weighed over the weekend. This was a Wednesday. Johnson took about 90 stones to Lokario for this purpose.

On Saturday, October 22d, Scaggs telephoned Johnson, and told him not to come to see Scaggs as had previously been agreed. Scaggs said: ''Don't come, don't call,'' that he would contact Johnson. He then said: ''Ditch the stuff. Bury it.'' Johnson then contacted the district attorney, who was given all the diamonds secured by Johnson and Lokario from Scaggs. Scaggs did not know this. Several times after October 22d Scaggs called Johnson, asking him to bring back the stones. Johnson told him that Lokario had them. Scaggs then told Johnson that he ''had to get them back, that he'd got them from some people and he had to give them back to them. . . . He said, 'If they can't get them back, somebody might get hurt,' '' and that lawyers were trying to get the stones back ''to satisfy the insurance company.'' Shortly thereafter Johnson had lunch with Scaggs and the latter again asked for the stones. When told by Johnson that he could not get them back, Scaggs said ''he'd have to send someone out, either the insurance company or the police, to my place.'' The next week, for the first time, Scaggs told Johnson that he had got the stones from Randolph. By this time the trial was pending, and Scaggs warned Johnson that he would have to bring his name into the proceedings. Scaggs denied to Johnson that he knew that the gems were stolen or that he had had anything to do with the theft, and suggested that Johnson turn the stones over to the police.

Lokario confirmed Johnson's testimony insofar as it affected him. He personally delivered the "baguettes" to the district attorney and was present when the 90 diamonds he was given to weigh were turned over to the district attorney.

The last major prosecution witness was Cecil Poole, an assistant district attorney. He testified that on October 23, 1955, he visited the Hall of Justice and there saw Scaggs and Jones with a police officer. He knew that the two were to be arrested because he had issued the complaint. Poole had known Scaggs for some time. He asked Scaggs to accompany him to a private office, and the two conversed there, alone. Poole asked Scaggs how he had become "mixed up in this business." Scaggs replied that he had counsel "and I have been advised by lawyers not to discuss the matter." Poole replied: "That is good advice, Pleas. If your lawyers have told you not to discuss the matter, you ought to accept their advice, or get rid of them and get other lawyers. You don't have to talk to me." Scaggs, however, said that he wanted to talk. Poole, during the conversation, took long-hand notes, and used these notes to refresh his recollection at the trial. A portion of Poole's testimony is considered prejudicial by appellant.

Scaggs told Poole that the whole thing was a mistake, and that he had been east attending the funeral of his brother when the diamonds were stolen, and had not returned to San Francisco until about the 4th of October.* When asked about the diamonds that he took to the hospital, Scaggs said that on October 19th Randolph had left a package with Scaggs for safekeeping; that Scaggs did not know what was in it; that on the 21st Randolph called from the hospital and asked for the package; that he then delivered it; that he first learned of the diamond theft while talking to Randolph's sons in the hospital. At this point Poole summoned Inspector Curtin, and, in Scaggs' presence, repeated the conversation up to that point. But when Poole reached the point in the conversation where Scaggs had claimed ignorance of the theft until October 21st, Scaggs changed his story. He then said that about a week before October 23d Curtin had come to Scaggs' hotel looking for Jones; that when Jones arrived Curtin and Jones conversed privately; that the next day Jones told Scaggs that there had been an "alleged theft"

*Actually it was probably October 5th. Scaggs' testimony as to his presence in Chicago on October 1st was corroborated by a Chicago lawyer, and by the stub of his air line ticket.

of diamonds, and that he, Jones, and his car, had been searched by the police. After Scaggs had thus corrected his story, Poole asked him if, in view of Jones' story, he had not been suspicious when Randolph gave him a package for safekeeping on October 19th. Scaggs replied that he had not, that he had not connected the two events. Scaggs stated that he was simply "a victim of circumstances." Poole then said that Scaggs knew of course that Randolph had been arrested, had confessed to having taken the diamonds, and "he has implicated you very deeply in this matter," and then asked Scaggs if he knew of any reason why Randolph, with whom Scaggs had stated he was on the friendliest terms, should lie by trying to implicate Scaggs in the deal. Scaggs replied: "I don't know why, but it certainly is a lie. . . . All I can say about him, he brought a lot of women to my hotel and he is kind of a chaser after women." Poole then asked Scaggs to cooperate with the police in trying to recover the balance of the diamonds. Scaggs replied that he did not know where the stones were and had had no part in the theft.

At about this place in the conversation, Poole reminded Scaggs that in telling his story he had said nothing about his trip to Seattle. This excited Scaggs. As Poole put it, Scaggs "had been sitting immediately in front of the desk . . . and when I asked him that he snapped back and removed his arm from the desk, and he said, 'Well, I'll tell you, Attorney Poole* . . . I don't think I'd better answer any more questions because I don't wish to incriminate myself. . . . I'd better follow my lawyer's advice." Then he said he had an appointment to see his lawyer and afterwards he would like to talk to Poole again, and left the room.

A little later, while Scaggs was being booked at the city prison, Poole walked by and Scaggs said to him: "About that Seattle trip that Randolph told you . . . As God is my judge, that man never sold a single diamond in my presence. He has never sold any diamonds at any time in my presence. I don't know what he's told you, but there wasn't a single diamond sold. It's just that it looks bad, but I've got an explanation, and I guess my side will have to come out in court." This was the first mention in their conversation about a sale of any diamonds. Scaggs' counsel did not cross-examine Poole.

---

*Prior to this in the conversation he had always referred to his interrogator as "Mr. Poole" or "Cecil."

It was stipulated that a revolver belonging to Randolph was found in Scaggs' room the night of his arrest. This constituted the case in chief for the prosecution.

Emil Jones was the first defense witness testifying on his own behalf. He was a student in a conservatory of music, and had known Scaggs for three years. He lived at Scaggs' hotel. Scaggs had introduced him to Randolph about three months prior to October of 1955. He had become a part-time chauffeur for Randolph. On the afternoon of October 1, 1955, he had driven Randolph down town and then parked. About an hour later Randolph returned to the car and handed him a package, saying: "This is a package. I bought this for the girl friend . . ., but I am not sure whether I want to give it to her or not. She's been treating me so mean. I have to make up my mind as to whether to give it to her or not. I will wait and see how she treats me tonight when I meet her. If she treats me all right, I'll give it to her, but you take it home and I'll pick it up." Randolph did not tell him what was in the package, nor did he make any reference to a theft. Jones took the package to his hotel and returned, as he had been directed, and parked near the Phelan Building. Shortly thereafter Randolph and Levin came and sat in the car. There was no mention of stolen property. Randolph and Levin then left the car and about half an hour later Randolph returned in company with an officer. The officer searched the car. Nothing was said about what they were looking for. Randolph and the officer then left and about a half hour later two officers approached the car. They asked Jones if he had moved the car since it had been parked where it was. Jones said "no." They asked Jones to identify himself, which he did. The car was again searched. No one said anything about a theft, nor was Jones asked if Randolph had brought anything to him. The officers left and shortly thereafter Randolph returned, the two had dinner together and Randolph told Jones he would pick up the package in the morning. Nothing was said about a theft, and Randolph explained the activities of the officers as just "looking around."

About 6 a. m. the next morning Randolph called for the package and it was delivered to him by Jones. Randolph asked Jones to drive him to the residential district where Randolph called on some person, and then Jones drove him back down town. Jones never saw the package again. Jones drove Scaggs and Randolph to the airport on October 17th or 18th, and picked them up at the airport. He next saw Randolph

in the hospital in company with Randolph's sons. One of the sons accused Jones of being with Randolph when he stole the diamonds. Jones replied that he was driving the car but had no knowledge of Randolph stealing anything or knowing what was in the package delivered to him by Randolph. He denied ever threatening Randolph with a gun, or of demanding any sum from Randolph.

Scaggs also took the stand. He testified that he had known Randolph for about 10 years. Randolph was a frequent patron of Scaggs' hotel, and Scaggs occasionally drove for Randolph. ''On many occasions'' Scaggs had pawned jewelry for Randolph. He testified that he was in Chicago between September 18th and October 5, 1955, in connection with his brother's death. This is undisputed. He admitted that the revolver found in his room when he was arrested belonged to Randolph, but stated that when Randolph was in the hospital on October 13th a doctor protested that Randolph could not keep the gun in his hospital room and Randolph asked him to take the gun, which he did.

After his return from Chicago he first met Randolph in front of his hotel on October 6th or 7th. The next day Randolph left a small package with him, saying that he would call for it the next day. It was so picked up. When Randolph was in the hospital the first time he asked Scaggs to drive him to the northwest on a jewelry selling trip. Scaggs refused to do so, but agreed to fly north with him. Randolph had a fear of heart attacks and wanted company. With Randolph's money, he purchased the air line tickets to Seattle and the two left on that trip early in the morning of October 17th. In Seattle they called on three jewelers. Scaggs was not carrying anything belonging to Randolph,* and was certainly not carrying any diamonds. Scaggs was not present when Randolph displayed his wares to the jewelers, and did not see any diamonds. After visiting the three jewelers, the two returned to the airport where Randolph discovered that he did not have enough money to buy return tickets. Randolph gave Scaggs two diamonds with instructions to pawn them in Scaggs' name. This was done, tickets were purchased with the proceeds, and the two returned to San Francsico.

On October 18th, Scaggs testified, Randolph left with him a package of diamonds which he wanted Johnson to weigh for him. Scaggs delivered the diamonds to Johnson. He never told Johnson that the diamonds belonged to Randolph, because

---

*One of the jewelers testified that Scaggs was carrying a jeweler's bag.

Randolph had requested that his name not be used. He denied that he sold Johnson 13 stones, adding, later in his testimony, that this sale was "by" Randolph. He admitted making three trips to the hospital to visit Randolph on October 21st. He admitted delivering the diamonds to Randolph at the latter's request on his second visit. He admitted that Randolph inquired about some missing diamonds, but seemed satisfied when Scaggs told him that the missing stones were with Johnson. On the third visit Jones and Randolph's two sons were also present. One of the sons said it "looked bad" for his father and asked Scaggs if he knew anything about "it." Scaggs professed ignorance, and was then, for the first time, informed of the theft from Levin.

Scaggs admitted that Inspector Curtin called at the hotel to see Jones about October 10th, but denied that he then learned that there had been a diamond theft. He laid the foundation for the later introduction into evidence of a tape recording made of a conversation between Randolph and Scaggs after the indictments but before trial. In this conversation Randolph repudiated most of the testimony given before the Grand Jury and later repeated at this trial.

Scaggs denied ever seeing Jones threaten Randolph with a gun or ever hearing Jones demand money from Randolph.

On cross-examination some of this testimony was seriously weakened. He denied some of Johnson's testimony. He got considerably involved as to when he first learned of the theft, denying some of the statements Poole had testified to as to when Scaggs had stated he first learned of the theft. He denied certain statements made to the police when arrested, although that interrogation was reported, and admitted lying to the police as to when he first learned he was in possession of diamonds. He produced several witnesses who corroborated his story that on several occasions prior to the theft he had acted for Randolph in jewelry transactions.

The prosecution produced Inspector Curtin on rebuttal, who corroborated Poole's testimony as to when Scaggs had stated he first learned of the theft. Curtin also testified that on October 10th, when he called at Scaggs' hotel to see Jones, Scaggs said to him: "I suppose you are here to interview Mr. Jones about the Randolph case?" Curtin replied affirmatively, and told Scaggs that Randolph had been in Levin's office at the time of the theft, and that Jones had been driving for Randolph that day. Scaggs replied that he had been in Chicago at the time of the theft but had learned about it from

Levin's office. Curtin also testified that when he later found the gun in Scaggs' apartment, Scaggs claimed that it was his, having been given to him by a tenant in lieu of rent.

We have reviewed the evidence at some length because appellant's counsel have made a determined, conscientious, and exhaustive effort to establish the impropriety of the conviction, mainly on the ground that the evidence is insufficient to sustain the conviction. This attack must fail, because the evidence reviewed above establishes all of the essential elements of the offense charged.

In *People* v. *Gould,* 111 Cal.App.2d 1, 4 [243 P.2d 809], the elements of the offense of receiving stolen property were correctly summarized as follows:

"1. That the property found in the possession of the defendant was acquired by acts constituting theft or extortion;

"2. That the defendant received, concealed or withheld the property from the owners; and

"3. That defendant knew the property was stolen."

Both sides agree that the evidentiary issue is whether the evidence supports the implied finding that Scaggs exercised dominion over the diamonds after he had the requisite knowledge that he was in possession of property stolen by Randolph.

In determining this question it must be kept in mind that it is the law that even though a person is not aware that property is stolen when he first comes into possession of it, if he subsequently learns of its stolen nature and then conceals or withholds it from its true owner, he is guilty of a violation of section 496 of the Penal Code. (*People* v. *Scott,* 108 Cal. App.2d 231 [238 P.2d 659]; *Goldman* v. *Superior Court,* 124 Cal.App.2d 165 [268 P.2d 134].) It is also the law that the requisite guilty knowledge can be inferred from circumstantial evidence. (*People* v. *Hartridge,* 134 Cal.App.2d 659 [286 P.2d 72].)

Appellant concedes, as he must, that Randolph's testimony, if believable, supports the requisite implied finding of knowledge, but seriously, and at length, contends that such testimony is not legally believable. This argument is premised on the contentions that Randolph's testimony "is one continuous mass of self-contradictions, so that even without other impeaching evidence ... [his] testimony is completely impeached by himself." (App. Op. Br. 6.) It is urged that "No man should be convicted on the testimony of such a discredited witness." (App. Op. Br. 18.) In support of these contentions appellant refers to numerous contradictions and inconsisten-

cies in Randolph's testimony. It is not necessary to set them forth. Undoubtedly Randolph left much to be desired as a witness. Undoubtedly, he frequently contradicted himself. Undoubtedly, he was inconsistent. Undoubtedly, he was extremely vague and confused about dates. The jury could have rejected his entire story. But apparently the jury did not. It apparently elected to believe Randolph, at least in part. It hardly needs citation of authority to establish that it is the jury and the trial judge who have had imposed upon them the responsibility of determining the credibility of the witnesses. This is not a function of appellate courts, except in unusual cases, of which this is not one.

In addition to many inconsistencies and contradictions in Randolph's evidence at the trial, appellant places considerable reliance, and rightly so, on the secret tape recording made by him of the conversation between Scaggs and Randolph after the grand jury had acted. This conversation contained much material opposed to that given at the trial. Several times during the conversation Randolph stated that Scaggs did not know that the diamonds had been stolen, and he also agreed with Scaggs that the latter did not have possession of the diamonds on the trip to Seattle. In this recorded conversation Randolph also stated that he had been told by his attorney that if he involved Scaggs and Jones he would get probation on the theft charge. This was important defense testimony, but it is not conclusive testimony. It was for the jury to decide when Randolph was telling the truth—before the grand jury and at the trial, or in this conversation.

In apparent realization of the weakness of his position on this argument, appellant next goes all the way and argues that Randolph should have been excluded as a witness entirely because he demonstrated that he was mentally incompetent. It is argued that Randolph's testimony ''passed beyond the point of merely being impeached and discredited . . . qualitatively, it is apparent that he is a completely incompetent witness . . . because of his senility and obviously unsound mind.'' (App. Op. Br. 18.) In addition to the inconsistencies and confusion in Randolph's testimony already discussed, attention is called to the fact that the hospital records show that Randolph's mind was degenerating. This point is without merit. No objection to Randolph's testimony was made at the trial. Objections to the competency of witnesses must be made in the trial court and cannot be raised for the first

time on appeal. (*People* v. *Singh,* 182 Cal. 457 [188 P. 987];
*People* v. *Lamb,* 121 Cal.App.2d 838 [264 P.2d 126]; *People* v.
*Horowitz,* 70 Cal.App.2d 675 [161 P.2d 833].) The question
of competence is for the trial court. Obviously, such a deli-
cate and personal evaluation as is involved in determining
competency cannot be made by an appellate court from a
typewritten record.

We have read, carefully, all of Randolph's testimony.
Certainly, it does not demonstrate, as a matter of law, that he
was incompetent, nor does it demonstrate, as a matter of law,
that it is unbelievable. This being so, Randolph's testimony
is legally sufficient to sustain the implied finding that appel-
lant knew that he was in possession of stolen property.

There is another complete answer to the contention that the
evidence is insufficient as a matter of law on the key issue,
and that is that, even without Randolph's testimony, there is
sufficient evidence to sustain the conviction.

The testimony of Johnson is that Scaggs and Jones were in
possession of the diamonds as early as October 8th, and he also
testified that Scaggs was still in possession of them on Octo-
ber 18th, when Scaggs sold 13 stones to Johnson. Scaggs
admitted being in possession of the diamonds until October
21st. The testimony of Poole and Curtin* establishes that
Scaggs knew of the diamond theft from Levin as early as
October 10th or 11th, and also knew on this date that Ran-
dolph was a suspect. Yet, even by Scaggs' own testimony,
on October 18th he received a package of diamonds from
Randolph and, according to Johnson, sold some of them.
Scaggs also testified that he accompanied Randolph to Seattle
on a diamond selling trip on October 17th, which was a week
after he had learned of the theft and Randolph's possible
connection with it. Johnson and Lokario testified that on
October 18th Scaggs sold to them for $150 diamonds with a
wholesale value of $450 and a retail value of over $900.

Possession of stolen goods which the possessor sells or
tries to sell at an inadequate price, coupled with suspicious
circumstances, supports an inference that the possessor re-
ceived the diamonds with knowledge that they had been stolen.
(*People* v. *Malouf,* 135 Cal.App.2d 697 [287 P.2d 834].)

The diamonds were returned to Randolph on October
21st, and the next day appellant canceled an interview with

---

*This testimony is asserted to be inadmissible. This point will be later
discussed.

Johnson and told him "Ditch the stuff. Bury it." Thus, independent of Randolph's testimony, we have the following timetable:

*October 8th*: Johnson has Jones and Scaggs in possession of the stolen diamonds.

*October 10th or 11th*: Curtin tells appellant of the Levin theft and of Randolph's and Jones' possible connection with it.

*October 17th*: Trip to Seattle to sell diamonds; also the date Scaggs testified he learned from Jones of the Levin theft.

*October 18th*: Appellant sells some stolen stones to Johnson for an inadequate price; this is the date that Scaggs testified he first received the package of diamonds from Randolph.

*October 21st*: Appellant returns stolen gems to Randolph.

*October 22d*: Appellant tells Johnson not to come see him but to "Ditch the stuff. Bury it."

The inferences that can be reasonably indulged based on that timetable are obvious. Counsel for appellant point out that this testimony and other evidence support inferences contrary to the one of guilty knowledge. As permissive as these inferences may be, they are not mandatory. ■ After conviction, it must be presumed that the jury drew the inferences consistent with guilt. (*People* v. *Gould,* 111 Cal.App. 2d 1 [243 P.2d 809].)

Appellant next contends that it was error to deny his motion for a new trial. He again argues the insufficiency of the evidence. That point has already been decided against him. He next contends that the trial court failed to exercise an independent judgment in passing on the motion, and relied wholly on the determination of the jury. If this were true it would violate the rule laid down in *People* v. *Robarge,* 41 Cal.2d 628 [262 P.2d 14]. In support of this point appellant refers to a purported discussion by the court in passing on the motion, giving as the transcript reference page 811. The reporter's transcript on file contains 807 pages. But even if we accept the discussion as quoted in appellant's opening brief, it would not help appellant. That discussion shows that the trial court actually did consider, independently of the jury's determination, whether or not the evidence was sufficient. In this connection the court placed particular emphasis on the testimony of Johnson and on the conduct of Scaggs, as disclosed in the record. There is no merit in the point.

■ The next major contention of appellant is that the

court committed reversible error in the admission of evidence. Appellant contends that the conversations with Scaggs testified to by Poole, Curtin and a police stenographer were inadmissible, and, even if admissible, required cautionary instructions. The authority cited in support of these contentions is *People* v. *Simmons,* 28 Cal.2d 699 [172 P.2d 18], particularly at page 712, et seq. That case clarified the rule that, following an arrest, an accused's response to an accusatory statement is admissible if at all only as an admission, and if he denies the accusation, or exercises his privilege against self-incrimination, there is no admission. The case lays down a limited rule of admissibility and then states that, even where admissible, the response must be considered "with great caution." (P. 718.)

The rule of the Simmons case is not applicable to the challenged testimony for several reasons. In the first place, no objection was made to this testimony in the trial court, nor did defense counsel request any admonition or instruction concerning its use. It is true that in the Simmons case, by way of dictum, the court considered the admissibility of the evidence in the absence of an objection by a public defender, but this dictum was apparently disapproved in *People* v. *Millum,* 42 Cal.2d 524, 528 [267 P.2d 1039], where it was held that failure to object to the introduction of the accusatory statement precluded the assertion of error on appeal. (See also *People* v. *Rodriquez,* 135 Cal.App.2d 757, 759 [288 P.2d 147].)

Another obvious reason why the rule of the Simmons case is not applicable, is that the damaging portions of the challenged conversations were not responses to accusatory statements at all. The damaging statement made in these conversations was that he knew as early as October 10th or 11th that a theft of diamonds had occurred and that the police were suspicious of Randolph and Jones. That statement was not in response to any accusation by anyone. In retrospect it turned out to be a damaging admission, and it was admissible as such. The same reasoning applies to the reported interview with the officers following Scaggs' arrest. As to Officer Curtin's testimony about his conversation with Scaggs on October 10th, that was several days before Scaggs was arrested, and consequently not within the rule of the Simmons case. That case only applies where the accused is under arrest or other form of compulsion. (See *People* v. *Davis,* 43 Cal.2d 661 [276 P.2d 801].) It should also be pointed out that the court's

instructions on admissions and accusatory statements amply protected Scaggs' rights. (Rep. Trans. 790-791.)

█ It is next contended that portions of the district attorney's opening statement were not later borne out by testimony, and that the court committed error in not so telling the jury at the close of the evidence. The defense failed to ask for such admonition. Moreover, at least twice in the trial the court instructed that the jury was not to consider statements of counsel as evidence. (Rep. Trans. 187 and 783.)

Appellant strenuously argues that the court abused its discretion in allowing the prosecutor to lead the witnesses Randolph and Levin. Again, there was a noticeable lack of objection in the trial court. During the examination of these witnesses only one objection on the ground that the questions were leading has been found, and that was by counsel for Jones. █ The allowance of leading questions, even over objection, is within the sound discretion of the trial court. Code Civ. Proc., § 2046; *People* v. *Mora,* 139 Cal.App.2d 266 [293 P.2d 522]; *People* v. *Mason,* 86 Cal.App.2d 445 [195 P.2d 60].) Particularly is there no abuse of discretion in permitting such questions of witnesses who are aged or sick. (*Stewart* v. *Marvin,* 139 Cal.App.2d 769 [294 P.2d 114].) There was no abuse of discretion shown here.

Appellant objects to the introduction into evidence of an incompleted diamond transaction between Randolph, Levin and defendant Jones with a Colonel Fletter and his butler Joel. The point is raised for the first time on appeal. The evidence was offered only against defendant Jones and his counsel withdrew a motion to strike it. The transaction had no bearing on Scaggs' guilt at all.

█ A rather incomprehensible objection is made to the evidence in connection with the "gun affair" at Millbrae. It will be remembered that Randolph testified that Jones picked up the gun, removed the cartridges and then pointed the gun at Randolph. Scaggs then prevented Jones from pointing the gun at Randolph. It is claimed that this evidence was "unduly prejudicial" because it constituted evidence of a general criminal disposition on the part of Scaggs. This is obviously without merit. The testimony that Scaggs took the gun from Jones rather favored Scaggs. Moreover, the jury obviously did not believe the incident occurred because it acquitted Jones.

Appellant claims that his privilege against self-incrimination was violated during his cross-examination. It will be

remembered that Poole testified that in his conversation with Scaggs the latter was talkative until the Seattle trip was mentioned and then took refuge in the privilege. On cross-examination of Scaggs the prosecutor asked him if he remembered taking advantage of the privilege and why it was that he "felt" that "any of the answers to any of the questions put by Mr. Poole might incriminate" him. Over objection, Scaggs was permitted to answer, the gist of which was that he did not recall the reason. It is clearly the law that, at least for the limited purpose of impeachment, such questions are proper. (*People* v. *Kynette*, 15 Cal.2d 731 [104 P.2d 794] (cert. den. 312 U.S. 703 [61 S.Ct. 806, 85 L.Ed. 1136]); *People* v. *Wayne*, 41 Cal.2d 814 [264 P.2d 547]; *People* v. *Jones*, 61 Cal.App.2d 608 [143 P.2d 726].) Clearly, there would have been no error if the court had given a limiting admonition, but none was requested. In the absence of a proffered instruction or other request for an admonition it is too late to make the objection at the appellate level. Moreover, the cross-examination on this point was quite insignificant. The refusal to discuss the matter further was not emphasized by the prosecutor (see *People* v. *Wayne*, 41 Cal.2d 814 [264 P.2d 547]), and the subject of the inquiry—the trip to Seattle—was later admitted to Poole, and explained at length by appellant at the trial.

 Objection is first made in this court that the trial court should, of its own motion, have admonished the jury to disregard certain of the comments of the prosecutor made during argument. The prosecutor argued that the third visit of appellant to the hospital after delivering the diamonds to Randolph was to "collect his loot"; that the failure of Scaggs to produce evidence from the airline that he returned to San Francisco on October 5th* permitted an inference that he had traveled under an assumed name; that Randolph had testified that Jones and Scaggs went to Millbrae and "took" the diamonds from him. On several occasions the prosecutor argued that appellant had "lied" on the witness stand. In addition to the fact that no objection or request for an admonition was made in the trial court (see *People* v. *Hampton*, 47 Cal.2d 239 at p. 240 [302 P.2d 300]), it is doubtful if such remarks were improper even if instructions had been submitted. The first two statements were reasonable inferences from the evidence. Randolph did testify that Scaggs "took" the diamonds

---

*Scaggs so testified, produced his ticket stub, and a lawyer from Chicago corroborated it.

from him at Millbrae. (Rep. Trans. 73.) With respect to the charges that appellant had lied, this too, was a reasonable inference. Either Scaggs or the prosecution lied, and the prosecutor was entitled to infer that it was Scaggs.

Appellant devotes 35 pages of his opening brief and six pages of his reply brief to the argument that the prosecutor was guilty of prejudicial misconduct. In view of the absence from the record of objections and requests to admonish, appellant's task is now a heavy one. As was said in *People* v. *Hampton*, 47 Cal.2d 239, 240 [302 P.2d 300] : ██ "The rule is established that unless the harmful results of misconduct of the district attorney cannot be obviated by appropriate instructions of the trial court, error cannot be predicated in this court on such alleged misconduct in the absence of (a) assignment of such misconduct as error and (b) a request to the trial court to instruct the jury to disregard. it. [Citing three recent cases.]" Most of the contentions made under this point have already been discussed with reference to claimed errors in the admission of evidence, and need not be here repeated. Others are so trivial as not to require discussion. As to some other matters, not already discussed, appellant has failed to meet the burden above indicated. It should also be mentioned that the jury was admonished by instructions to disregard intimations of hinted facts (Rep. Trans. 783) ; to not regard as evidence statements of counsel concerning facts (Rep. Trans. 784) ; and that evidence received against one defendant should be considered only against that defendant (Rep. Trans. 791). We have considered all of the claimed instances of misconduct. Most of the claimed misstatements in the opening statement and in argument were not misstatements but legitimate inferences drawn from admissible testimony. The few instances of overstatement were trivial, and certainly not prejudicial.

The last major objection of appellant is that the instructions were prejudicially insufficient. ██ Most of the objections are minor, and all but one of the claimed inadequacies were waived by the failure to ask for different or more detailed instructions. (*People* v. *Holbrook*, 45 Cal.2d 228 [288 P.2d 1] ; *People* v. *Weitz*, 42 Cal.2d 338 [267 P.2d 295].) ██ Thus, it is contended that the court should have instructed that the jury should view with "great caution" testimony which purports to be an admission. The court stated that such evidence is to be viewed with "caution." A similar complaint is made of the instruction relating to accusatory statements.

Appellant requested no instructions at all on these points. If he had wanted the court to instruct that "great caution" instead of "caution" should have been used in these matters he should have submitted such an instruction.

 Objection is made to the failure of the court to instruct that in the case of a denied accusation the accusation and response are hearsay and inadmissible. This is undoubtedly a correct statement of the law. (*People* v. *Simmons,* 28 Cal.2d 699, at p. 712 [172 P.2d 18].) The court did instruct that a failure to deny, or the giving of false, evasive or contradictory denials constituted admissions. In the absence of a request for a proper instruction the given instruction was sufficient in that it necessarily implies that a flat denial is not an admission.

 Appellant also objects that the instructions on accusatory statements and responses thereto were prejudicial because of their failure to distinguish between responses made before and after arrest, and between accusations made by law enforcement officials and private persons. Again, there was a failure to request an instruction embodying these distinctions. Under the circumstances, the instruction that was given which blanketed together all responses to accusations and all false and misleading statements by the accused, and required them to be viewed with "caution," whether or not made under compulsion, was sufficient.

Complaint is made of an instruction given after the jury retired in response to the question: "Is the verdict of guilty of receiving stolen property to be based on knowledge at the original time of receiving or on knowledge acquired at a later date?" The court answered this question as follows: "One of the possible elements of this crime, entitled 'Receiving stolen property' is concealing or withholding personal property known to be the property of others and knowing the property was stolen. Therefore, whether the knowledge that the property was stolen—knowledge of the nature of the property being stolen property was acquired at the time of the original receipt of the property or *whether the knowledge that the property was stolen was acquired at a later date, while the person receiving had possession, control and dominion over it, knowledge in either case is sufficient to warrant a finding of guilty against the Defendant who was charged with knowledge of that type.*" (Rep. Trans. 795-796. Emphasis added.)

 Appellant complains of the italicized portion of this instruction. He contends that it permitted the jury to find

that appellant was guilty even though he attempted to return the diamonds to Randolph immediately upon learning that they were stolen. In such case, there would have been no crime. (*People* v. *Scott*, 108 Cal.App.2d 231 [238 P.2d 659].) Reading the instruction as a whole, as we must, it is not subject to the criticism offered. The first sentence of the instruction correctly informed the jury that it was "concealing" or "withholding" of property "known" to be stolen that constituted the crime. Thus, the instruction was properly limited.

 Appellant complains of the trial court's failure to give his submitted instructions on circumstantial evidence. The gist of the submitted instructions was that to establish guilt, circumstantial evidence must permit no reasonable inference of innocence. Although not stated in the language submitted by appellant, the jury was told precisely this. (Rep. Trans. p. 789.) Thus, this issue involved was sufficiently covered by the instructions given. (See Rep. Trans. 788-790.)

Counsel have been diligent in trying to find error. They have prepared able briefs on behalf of their client. They have argued practically every point that ingenuity and industry could suggest. The difficulty with their position is that the rather long trial is remarkably free from error.

The judgment and order appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 16, 1957.